RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0452p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

　　　　　　　*Plaintiff-Appellee,*

　　　*v.*

CALVIN CAVER (05-3295); TAMIR ABDULLAH
(05-3297); FRED CLOUD (05-3344),

　　　　　　　*Defendants-Appellants.*

Nos. 05-3295/3297/3344

>

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 03-00486—Peter C. Economus, District Judge.

Argued: September 19, 2006

Decided and Filed: December 4, 2006

Before: CLAY and GILMAN, Circuit Judges; OBERDORFER, District Judge.[*]

---

## COUNSEL

**ARGUED:** Kevin M. Schad, SCHAD & SCHAD, Lebanon, Ohio, F. Clinton Broden, BRODEN & MICKELSON, Dallas, Texas, Ryan D. Walters, SQUIRE, SANDERS & DEMPSEY, Cincinnati, Ohio, for Appellants. Edward F. Feran, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Kevin M. Schad, SCHAD & SCHAD, Lebanon, Ohio, F. Clinton Broden, BRODEN & MICKELSON, Dallas, Texas, Pierre H. Bergeron, SQUIRE, SANDERS & DEMPSEY, Cincinnati, Ohio, for Appellants. Bruce A. Khula, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

---

## OPINION

---

CLAY, Circuit Judge. "Operation Snow Removal," an investigation into drug crimes in the city of Cleveland, Ohio, led to the indictment of 15 alleged conspirators on December 17, 2003. Many of the alleged conspirators pleaded guilty; Defendants Caver, Abdullah, and Cloud (collectively "Defendants") did not. They proceeded to trial, and were found guilty of conspiracy

---

[*]The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by designation.

to possess crack cocaine and possession of crack cocaine with the intent to distribute.[1]   On September 27, 2004, Defendants Caver and Abdullah were sentenced to life without release; Defendant Cloud was sentenced to 30 years imprisonment. Defendants filed a timely notice of appeal.

On appeal, Defendants, either collectively or individually, argue that their convictions should be overturned because (1) the evidence was insufficient to support a conspiracy; (2) there was a prejudicial variance between the indictment and the proof at trial; (3) the district court improperly denied Defendant Caver's motion for a severance; (4) the district court made erroneous evidentiary rulings; (5) the district court improperly refused to grant a mistrial in response to improper outbursts by government witnesses; (6) the district court gave erroneous jury instructions; (7) Defendants' sentences are unconstitutional or unreasonable under *Booker*;[2] and (8) Defendant Cloud was denied effective assistance of counsel. For the reasons stated below, we **AFFIRM** Defendants' convictions and sentences.

## I.

## BACKGROUND

This case involves drug and drug-related offenses that occurred in the city of Cleveland, Ohio, in the area of West 80th Street, West 83rd Street, and Detroit Avenue, during the years 2002 and 2003. In 2002, the Cleveland Police Department conducted an investigation known as "Operation Snow Removal" and found that this area of Cleveland had the highest crime rate in the police district. The Cleveland Police Department and the United States Drug Enforcement Agency cooperatively developed a plan targeting the main suspects involved in the drug trade in this area.

On March 18, 2003, a Cleveland Police Department detective, Schroeder, while conducting surveillance, observed a black Dodge Intrepid circling the block. He followed this car to a gas station, where he observed a man on a bicycle ride up to the passenger side window of the car and reach into the vehicle. The Intrepid drove off, and Schroeder followed it. It parked on a nearby street, and a minute later, a Ford Probe pulled up. The driver of the Probe got out of his car and got into the back seat of the Intrepid. Shortly thereafter, the driver of the Probe exited the Intrepid, returned to the Probe, and drove away. Schroeder stopped the Probe, and radioed for another officer to stop the Intrepid. Officer Bunjnak, acting on Schroeder's instruction, stopped the Intrepid, and observed Defendant Caver holding a bag of crack cocaine in his lap. Bunjnak arrested Defendant Caver, searched him, and found two pagers, lottery tickets, plastic baggies, and $242 of cash. He also found two cell phones on the passenger side of the Intrepid. The crack cocaine recovered from Defendant Caver weighed 12.04 grams.

On April 2, 2003, officers involved in Operation Snow Removal arrested Rahsaan Felix, a named but unindicted coconspirator in this case. Felix led police officers to Michael Morris, a drug dealer who supplied many other drug dealers in the target area. Morris agreed to cooperate with

---

[1]Specifically, all Defendants were found guilty of one count of conspiracy to possess with intent to distribute more than 50 grams of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Defendant Caver additionally was found guilty of one count of possession with the intent to distribute 12.04 grams of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and one count of possession with the intent to distribute 2.92 grams of crack cocaine under 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Defendant Abdullah was additionally found guilty of one count of possession with the intent to distribute 20.8 grams of crack cocaine under 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and aiding and abetting under 18 U.S.C. § 2.

[2]*United States v. Booker*, 543 U.S. 220, 261 (2005).

police, and on May 13, 2003,**3** the police planned to have Morris purchase drugs from Defendant Cloud and Arroyal Hall, another coconspirator. Morris was to purchase an ounce of crack cocaine from Hall and Defendant Cloud for $1,700. Morris met Hall and Defendant Abdullah (not Defendant Cloud, as originally planned) and the three of them drove to an apartment on Detroit Avenue, where the drugs were held. While parking the car, Hall recognized the undercover police car that was following Morris, and refused to go through with the transaction. Morris dropped Hall off at home. Defendant Abdullah, however, agreed to go through with the transaction. Morris paid only a portion of the money, $800, and received 20.8 grams of crack cocaine. Morris then dropped Defendant Abdullah off at Hall's home, and turned the crack cocaine over to police officers.

On June 17, 2003, police officers set up a controlled drug purchase of $50 worth of crack cocaine from Defendant Caver, using a reliable confidential informant. The informant told police that Defendant Caver would be arriving in a white car. When the white car arrived, Defendant Caver was driving, and the police arrested him. They recovered a bag of crack cocaine weighing 2.92 grams, $205, a cell phone, and a business card with the telephone number of the recovered cell phone listed on it.

On October 3, 2003, police were watching for drug activity from an apartment "perch." They observed a van drive onto the street, and a number of males who had been loitering on the street ran to the passenger side of the van. Suspecting a drug deal, the police stopped the van. The driver, who was Defendant Cloud, fled the van, but was apprehended. The front seat passenger was Defendant Abdullah. Police arrested Defendant Cloud and another passenger, and searched the van. The search did not reveal any drugs, but the police did recover photographs which depicted Defendant Cloud, Defendant Abdullah, and other suspects in various poses with money and cars. In one of the pictures, Defendant Cloud had a gun in his waistband.

On December 17, 2003, Defendants were indicted, along with 12 other coconspirators, for conspiracy to possess with the intent to distribute more than 50 grams of a mixture or substance containing a detectable amount of cocaine base, over a period beginning in 2002 and continuing throughout 2003, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and § 846. Additionally, Defendant Caver was indicted for possession with the intent to distribute 12.04 grams of crack cocaine stemming from his arrest on March 18, 2003. Defendant Caver was also indicted in a separate count for possession with the intent to distribute crack cocaine in the amount of 2.93 grams stemming from his arrest on June 17, 2003. Defendant Abdullah was indicted for possession with the intent to distribute 20.8 grams of crack cocaine stemming from the May 13, 2003 sale to Morris.**4**

Only Defendants went to trial. Trial began on September 14, 2004. The prosecution's case included the testimony of police officers who recounted the events previously described, and the testimony of fifteen alleged coconspirators. The testimony elicited by the alleged coconspirators placed Defendants and the other alleged coconspirators within an intricate economic web of crack cocaine transactions. Because this testimony is necessary to the determination of the legal issues in this case, we briefly summarize the coconspirators' testimony at trial:

---

**3**The events described here began at approximately 11:00 in the evening on May 13, 2003 and continued into May 14, 2003.

**4**A superceding indictment was filed on July 20, 2004. The superceding indictment charged only Defendants, but listed the defendants from the original indictment and several additional persons as named but unindicted coconspirators. Additionally, the superceding indictment included specifications for obstruction of justice, criminal history, and drug quantities of over 1.5 kilograms with respect to all Defendants, and a career offender status specification with respect to Defendants Abdullah and Cloud.

**A. Michael Morris**. Morris testified that he sold one-eighth of a kilogram of crack cocaine to Defendant Cloud "every day." J.A. at 965. Morris also stated that he sold one-ounce quantities of crack cocaine to Defendant Abdullah "once or twice," but that Morris was not Defendant Abdullah's regular supplier. J.A. at 948. Morris also testified that he did not sell Defendant Caver any drugs in 2002 or 2003. Additionally, Morris testified that he sold crack cocaine to Arroyal Hall, Yohnell Walker, Rondell Wylie, and Demetrius Bell over the relevant time frame.

**B. Arroyal Hall.** Hall testified that he sold large amounts of crack cocaine, ounces or portions of an ounce, to Defendant Abdullah "every day, or every other day." J.A. at 1084. He testified that he was also friends with Defendant Abdullah. Hall testified that Defendant Cloud was his best friend, that he and Defendant Cloud sold drugs together in 2002 and 2003, and that they would pool their money together to purchase crack cocaine from Morris. According to Hall, the two would use each other's suppliers to purchase crack cocaine, and he and Defendant Cloud would purchase a quarter or an eighth of a kilogram "every day almost." J.A. at 1125. Hall also testified that he sold drugs to Defendant Caver in one-ounce quantities numerous times during 2002 and 2003.

Additionally, Hall testified that during the time of the alleged conspiracy, Hall sold crack cocaine to Yohnell Walker, Derek Stokes, Rondell Wylie, Demetrius Bell, David Anderson, Ralph Jones, Allen Wilson, Jermaine Jones, and Randall Ramsey. Hall testified that he purchased crack cocaine from Michael Morris.

**C. Andre Collier.** Collier testified that he was a street level dealer. Collier testified that, over the relevant period, he purchased crack cocaine from Defendant Cloud "just a few times" in quarter-ounce, eighth-ounce, or one-ounce quantities. J.A. at 1202. He also testified that he had purchased crack cocaine from Defendant Caver one or two times. Additionally, Collier testified that he purchased crack cocaine from Yohnell Walker and Rondell Wylie.

**D. Hasan Howard**. Howard testified only with respect to Defendant Abdullah. He testified that, on three occasions during the relevant period, he had sold Defendant Abdullah $600 worth of crack cocaine.

**E. Rahassan Felix.** Felix testified that, on two or three occasions during the period of the indictment, he had purchased crack cocaine from Defendant Abdullah in a total amount of approximately 1.5 to 2 ounces. Felix testified that he sold crack cocaine to Defendant Cloud two or three times over the relevant time period. Felix also testified that he had purchased an ounce of crack cocaine from Defendant Caver on only one occasion. Additionally, Felix testified that he purchased crack cocaine from Demetrius Bell and Michael Morris, and that he sold crack cocaine to Allen Wilson and Jermaine Jones.

**F. David Anderson.** Anderson testified that he was a street level crack dealer. He testified that, during the relevant period, Defendant Cloud had sold him crack cocaine several times in eighth-ounce quantities and $200 amounts. He testified that Defendant Abdullah had sold him crack cocaine several times, also in eighth-ounce quantities and $200 amounts. Additionally, Anderson testified that he bought crack cocaine from Derek Stokes and Rondell Wylie.

**G. Derek Stokes.** Stokes testified that, over the relevant period, he purchased crack cocaine from Defendant Abdullah once a week, in eighth-ounce quantities. Additionally, Stokes testified that he purchased crack cocaine from Randall Ramsey, Andre Collier, Yohnell Walker, and Rondell Wylie.

**H. Allen Wilson.** Wilson testified that, over the relevant period, he purchased crack cocaine from Defendant Cloud two or three times, in $100 amounts. He testified that he purchased crack cocaine from Defendant Abdullah once or twice, in $50 or $100 amounts. Wilson also testified that

he purchased crack cocaine from Defendant Caver between five and ten times, in $100 amounts. Additionally, Wilson testified that he bought crack cocaine from Rahssan Felix, Stephon Davis, Rondell Wylie, and Arroyal Hall.

**I. Rondell Wylie.** Wylie testified that, over the relevant period, he purchased crack cocaine from Defendant Caver a couple of times in quarter-ounce quantities, and that he sold crack cocaine to Defendant Caver a couple of times, in quarter- or half-ounce quantities. He additionally testified that he bought crack cocaine from Yohnell Walker, Arroyal Hall, Michael Morris, Andre Collier, and Demetrius Bell, and that he sold crack to Demetrius Bell, Andre Collier, Yohnell Walker, and David Anderson.

**J. Latoya Taylor.** Taylor testified that she purchased three grams of crack cocaine from Defendant Cloud once during the period of the indictment.

**K. Stephon Davis.** Davis testified that in 2002 to 2003 he purchased crack cocaine in the quantity of one ounce from Defendant Cloud. He additionally testified that he sold crack cocaine over the relevant period to Latoya Taylor, Jermaine Jones, Yohnell Walker, David Anderson, and Ralph Jones.

**L. Ralph Jones.** Ralph Jones testified that over the relevant time period he purchased crack cocaine from Defendant Cloud more than ten times, with a maximum quantity of one ounce. He testified that he purchased crack cocaine from Defendant Abdullah five or six times, in eighth-ounce quantities. Ralph Jones also testified that he purchased crack cocaine from Defendant Caver over twenty times, in quarter- or half-ounce quantities. He testified that Defendant Caver offered Ralph Jones employment as a "jump boy," which is a person who holds the drugs and runs away if the police show up, and that on a few occasions Ralph Jones acted as a "jump boy" for Defendant Caver. Defendant Caver paid him $300 to $400 dollars for this service. Ralph Jones also testified that he and Defendant Caver took photographs of the neighborhood, in order to formulate a method of avoiding the police. Ralph Jones additionally testified that over the relevant period he purchased crack cocaine from Arroyal Hall, Michael Morris, Stephon Davis, Yohnell Walker, Derek Stokes, Rondell Wylie, Demetrius Bell, Andre Collier, Allen Wilson, and Randall Ramsey. Ralph Jones testified that he sold crack cocaine over the relevant period to Yohnell Walker, Derek Stokes, Rondell Wylie, David Anderson, Demetrius Bell, Andre Collier, Jermaine Jones, and Randall Ramsey.

**M. Jermaine Jones.** Jermaine Jones testified that, over the relevant period, he purchased crack cocaine from Defendant Cloud, in $200 and $400 amounts, two to three times per week. Jermaine Jones also testified that he purchase crack cocaine from Defendant Caver about ten to fifteen times, in quarter- and half-ounce amounts.

**N. Yohnell Walker.** Walker testified that, over the relevant period, he purchased crack cocaine from Defendant Cloud in quarter- and one-ounce quantities four to five times. Walker testified that he purchased crack cocaine from Defendant Abdullah in eighth- and quarter-ounce quantities a few times. Walker also testified that he purchased crack cocaine from Defendant Caver in half- and one-ounce quantities, with an approximate total quantity purchased of a quarter kilogram. He testified that he sold crack cocaine to Defendant Caver in quantities of a half-ounce, 2.25 ounces, and an eighth of a kilogram. Additionally, Walker testified that he purchased crack cocaine from Hasan Howard, Arroyal Hall, Michael Morris, Stephon Davis, Demetrius Bell, Andre Collier, and Rondell Wylie.

**O. Patricia McCristall.** McCristall testified that she purchased $100 amounts and quarter-ounce quantities of crack cocaine from Defendant Caver a half dozen times over the relevant period.

In addition to this extensive testimony concerning drug transactions with alleged coconspirators, the prosecution also presented letters that Defendants Cloud and Caver had written to other coconspirators. Some of these letters urged the coconspirators to sign affidavits (that were included in the letter) stating that they had never sold drugs to Defendants Cloud or Caver. Defendant Cloud's letters were often hostile in tone, and in some instances included thinly-veiled death threats. Defendant Caver's letters were neither hostile nor threatening.

On September 21, 2004, the case was submitted to a jury. The jury returned a verdict of guilty on September 22, 2004, against all Defendants as to all counts. On March 4, 2005, the district court sentenced Defendants Caver and Abdullah to life in prison without release, and sentenced Defendant Cloud to a term of thirty years imprisonment.[5] Defendants filed timely notices of appeal.

## II.

## DISCUSSION

### A.   SUFFICIENCY OF THE EVIDENCE

Defendants first argue, with respect to each of them, that the evidence presented at trial was insufficient to support a conviction for conspiracy to possess with the intent to distribute crack cocaine. "When reviewing for the sufficiency of evidence in support of a jury verdict, this Court views the evidence in the light most favorable to the prosecution and gives the prosecution the benefit of all reasonable inferences from the testimony." *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir.), *cert denied*, 127 S. Ct. 446 (2006). The question the court must ask is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Evans*, 883 F.2d 496, 501 (6th Cir. 1989) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The elements of conspiracy are "'(1) [a]n object to be accomplished. (2) A plan or scheme embodying the means to accomplish that object. (3) An agreement or understanding between two or more of the defendants whereby they become definitely committed to cooperate for the accomplishment of the object by the means embodied in the agreement, or by any effectual means.'" *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999) (quoting *United States v. Bostic*, 480 F.2d 965, 968 (6th Cir. 1973)). In the specific context of § 846, "the government must prove, beyond a reasonable doubt, '(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy.'" *Id.* at 420 (quoting *United States v. Welch*, 97 F.3d 142, 148 (6th Cir. 1996)).

An agreement to violate the drug laws need not be express or formal. "A tacit or mutual understanding among the parties is sufficient." *United States v. Forrest*, 17 F.3d 916, 918 (6th Cir. 1994). But the evidence must nevertheless demonstrate that the defendant had knowledge of the conspiracy's object and consciously committed himself to the furtherance of that object. *United States v. Hodges*, 935 F.2d 766, 772 (6th Cir. 1991). However, once the existence a conspiracy is

---

[5]Defendant Caver was sentenced to life in prison without release for conspiracy to possess with intent to distribute crack cocaine in violation of 21 U.S.C. §§ 841(b)(1)(A) & 846. Defendant Caver was also sentenced to ten years imprisonment for each of his two convictions for possession with intent to distribute crack cocaine under 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and 841(a)(1) and (b)(1)(C), with the sentences to run concurrently. The district court also sentenced Defendant Abdullah to life without release on his conviction for conspiracy to possess with the intent to distribute crack cocaine under 21 U.S.C. §§ 841(b)(1)(A) & 846, and ten years imprisonment for possession with intent to distribute cocaine base and aiding and abetting under 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2. The district court sentenced Defendant Cloud to a term of 30 years imprisonment on his conviction for conspiracy to possess with the intent to distribute crack cocaine under 21 U.S.C. §§ 841(b)(1)(A) & 846.

shown, the evidence linking an individual defendant to that conspiracy need only be slight. *United States v. Henley*, 360 F.3d 509, 514 (6th Cir. 2004).

Like many legitimate industries, the distribution of drugs from suppliers, through middlemen, to the end consumer often assumes a vertical pattern of distribution, where each successive distributor sells a lower volume to any particular customer. Where drugs are concerned, this can form a "chain" conspiracy where an agreement to supply drugs to a given area can be inferred from the interdependence of the enterprise. *See id.* ("'One can assume that the participants understand that they are participating in a joint enterprise because success is dependent on the success of those from whom they buy and to whom they sell.'" (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999))). That said, the agreement to enter into a transaction, which must by definition exist between a willing buyer and a willing seller, is not equivalent to the agreement needed to support a conviction for conspiracy. *Gibbs*, 182 F.3d at 421. Instead, a conviction must be based on evidence from which a rational trier of fact could find that the defendant had knowledge of the conspiracy itself, and purposefully joined the conspiracy. *See United States v. Grunsfeld*, 558 F.2d 1231, 1235 (6th Cir. 1977). This can be inferred through circumstantial evidence, *Henley*, 360 F.3d at 513, including evidence of repeated purchases, or evidence of a large quantity of drugs. *United States v. Martinez*, 430 F.3d 317, 333 (6th Cir. 2005), *cert. denied*, 126 S. Ct. 1603 (2006) (citing *United State v. Brown*, 332 F.3d 363, 373 (6th Cir. 2003)).

Defendants first argue that the evidence showed that independent individuals operated in the same area, buying and selling crack cocaine as self-interested competitors, not as members of a chain conspiracy. This contention is without merit. The government produced ample evidence of a conspiracy. This evidence included testimony that conspirators pooled money to purchase drugs, as Defendant Cloud did with Hall, and testimony that conspirators cooperated to attempt to evade law enforcement, such as Defendant Caver taking photographs with Ralph Jones, or Defendant Cloud discussing ways to elude the law with Wilson, Bell, Wylie, and Hall. The government also presented evidence that conspirators worked together, such as when Defendant Abdullah intended to work with Hall to sell crack cocaine to Morris, before Hall backed out because he recognized the undercover police car. Moreover, the record demonstrates that all Defendants repeatedly engaged in regular, high-volume drug sales. This evidence was sufficient for a reasonable jury to find the existence of a conspiracy. *See Martinez*, 430 F.3d at 332-33.

Defendants next argue, citing *Henley*, that no conspiracy exists here because the alleged coconspirators did not depend on each other for success.[6] *See Henley*, 360 F.3d at 513 ("One can assume that the participants understand that they are participating in a joint enterprise because success is dependent on the success of those from whom they buy and to whom they sell." (quoting *Spearman*, 186 F.3d at 746)). But this Court has never held that conspirators must only buy from and/or only sell to one individual in order for a "chain" conspiracy to exist. *See Spearman*, 186 F.3d at 745 (upholding convictions for conspiracy where testimony demonstrated that it was "common for people who sold cocaine to buy back and forth from one another when their supplies ran low"). The distribution patterns here were generally hierarchical, notwithstanding the fact that individuals at various levels of distribution did buy and sell to one another, or purchase drugs from sources who were not their normal suppliers. As officer Lucas testified at trial, Cleveland was a "consumer" city

---

[6]Defendant Cloud also argues that he could not "depend on" other coconspirators for success because the evidence demonstrated that he did not transact business with several members of the conspiracy. This argument is inconsistent with the longstanding principle that a conspiracy conviction will stand if "each member of the conspiracy realized that he was participating in a joint venture, even if he did not know the identities of every other member, or was not involved in all the activities in furtherance of the conspiracy." *Martinez*, 430 F.3d at 332-33; *Blumenthal v. United States*, 332 U.S. 539, 556-57 (1947); *see also United States v. Potts*, No. 97-6000, 1999 WL 96756, *7 (6th Cir. Feb. 2, 1999) (unpublished disposition) (holding that evidence was sufficient for jury to find that the defendant participated in the conspiracy "even though he did not have a relationship with all of his fellow co-conspirators").

where, when one dealer's source of supply runs out, purchaser and seller arrangements may realign. The fact that there were sales between conspirators that deviated from a pure pyramid structure does nothing, however, to strengthen Defendants' case. The crux of the matter is whether Defendants agreed to engage in a cooperative enterprise, as opposed to mere buyer/seller relationships, and the existence of these non-hierarchical sales is at least *as* consistent with a finding that the former was the true nature of Defendants' dealings.

Defendants each individually argue that, even if the evidence was sufficient for a rational jury to find a conspiracy, the evidence did not show that they were part of that conspiracy. We address each of these claims in turn.

### 1. Defendant Cloud

There was sufficient evidence for a rational jury to find that Defendant Cloud was a member of the conspiracy for which he was indicted. The evidence demonstrated that Defendant Cloud combined his money together with Hall to purchase large quantities of drugs on repeated occasions. Defendant Hall testified that they would pool their money together and buy an eighth or a quarter of a kilogram of crack cocaine "every day almost." In addition, Defendant Cloud sold drugs on repeated occasions to Collier, Felix, Wilson, Ralph Jones, Jermaine Jones, and Walker. Notably, Defendant Cloud's distribution to Jermaine Jones occurred two to three times per week over the period in question. This evidence clearly can establish more than a buyer/seller relationship; it suffices to establish a conspiracy. *See Brown*, 332 F.3d at 373 (holding that a close relationship between alleged conspirators and repeated, large volume transactions were sufficient to establish a conspiracy).

### 2. Defendant Abdullah

The evidence is likewise sufficient to conclude that Defendant Abdullah was a participant in the conspiracy. The government produced evidence that Defendant Abdullah also engaged in repeated, high-volume sales and purchases of crack cocaine. Hall testified that he sold Defendant Abdullah ounces or portions of an ounce of crack cocaine "every day, or every other day." Stokes testified that he purchased crack from Defendant Abdullah once a week. Howard, Morris, Anderson, Ralph Jones, and Walker also testified that they had engaged in crack cocaine transactions with Defendant Abdullah on more than one occasion. There was also evidence that Defendant Abdullah cooperated with other coconspirators. For example, Defendant Abdullah accompanied Hall to sell Morris crack cocaine. Ralph Jones also testified that, on some occasions, Jones would call Defendant Cloud for drugs, but Defendant Abdullah would instead show up to complete the transaction. This evidence is sufficient for a jury to conclude that Defendant Abdullah had voluntarily agreed to enter into a conspiracy to possess crack cocaine with the intent to distribute. *See id.*

### 3. Defendant Caver

The evidence is also sufficient to conclude that Defendant Caver knowingly agreed to become a member of the conspiracy. Witnesses at trial likewise testified about repeated, high-volume sales and purchases with Defendant Caver. Hall sold Defendant Caver one-ounce quantities numerous times during the relevant period. Wilson, Ralph Jones, Jermaine Jones, Walker, McCristall, and Wylie also testified that they engaged in multiple transactions with Defendant Caver. Defendant Caver actively cooperated with Ralph Jones in efforts to evade the police, both by paying Jones to act as a "jump boy" and by photographing the neighborhood. These efforts were clearly designed to further the distribution of crack cocaine. In sum, the evidence at trial was sufficient to allow a jury to infer that Defendant Caver had knowingly participated in a conspiracy, and was not just a mere buyer or seller. *See id.*; *Cf. Henley*, 360 F.3d at 514 (trust between drug dealers involved in extending drugs on credit supports the inference of a conspiracy).

## B.    VARIANCE

On appeal, Defendants argue that a variance existed between the proof offered at trial and the allegations in the indictment because, according to Defendants, the indictment alleged only a single conspiracy and the evidence at trial demonstrated, at most, multiple conspiracies. This court requires that the issue of variance be raised at trial. *United States v. Wilson*, 168 F.3d 916, 923 (6th Cir. 1999). Because Defendants Cloud and Abdullah did not raise the issue of variance at trial, we review their claims only for plain error. *Id.* Defendant Caver did, however, raise the issue before the district court. We will therefore reverse his conviction if a variance occurred and that variance affected his substantial rights. *United States v. Blackwell*, 459 F.3d 739, 762 (6th Cir. 2006) (citing *United States v. Solorio*, 337 F.3d 580, 589 (6th Cir. 2003)).

The court of appeals reviews the question of whether a variance has occurred *de novo*. *Solorio*, 337 F.3d at 589. A variance to the indictment occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment. *Id*. Within the context of a conspiracy, a variance constitutes reversible error only if a defendant demonstrates that he was prejudiced by the variance and that the "indictment allege[d] one conspiracy, but the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies." *United States v. Warner*, 690 F.2d 545, 548 (6th Cir. 1982) (emphasis added). In making this determination, the evidence must be viewed in the light most favorable to the government. *See id.* at 549.

### 1.  Existence of a single conspiracy

In the instant case, the evidence does not exclude the possibility that Defendants were part of a single conspiracy. Stripping away the many interconnecting drug transactions that occurred between various conspirators on infrequent occasions, testimony established that there was a regular pattern of distribution for a large quantity of drugs:  Morris would sell one-eighth kilograms to Hall and Cloud working together "every day almost." J.A. at 1125. Hall would then sell ounces to Defendant Abdullah, "every day, or every other day." J.A. at 1084. Hall also sold drugs to Defendant Caver in one-ounce quantities "numerous times." J.A. at 1142. Even if the direct contacts between Defendant Caver and Defendant Abdullah were infrequent or nonexistent, a reasonable jury could find that all three defendants were part of a single "chain" conspiracy. *See Warner*, 690 F.2d at 549 ("[A] single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy."). Defendants Abdullah and Caver were on the same "horizontal" level of distribution because both[7] defendants were supplied from drugs jointly purchased from Morris by Defendant Cloud and Hall. Our cases demonstrate that two parties, on the same horizontal level of distribution, can be part of a single "chain" conspiracy. In *United States v. Lee*, 991 F.2d 343 (6th Cir. 1993), we held that the government had proven a single conspiracy under materially indistinguishable facts. In *Lee*, defendant Lee assisted Dortch in the transportation of cocaine from Miami, Florida to Detroit, Michigan, where Lee then assisted in its distribution. *Id.* at 349. In rejecting Lee's argument that multiple conspiracies were proven, we held that "[a]lthough Dortch may have had several 'customers' in the Detroit area, each of these customers were part of the same 'chain' conspiracy, the object of which was the transportation of cocaine from Florida to Michigan and the distribution of cocaine in the Detroit area." *Id.* Similarly, the jury could have found that Defendants here were part of a single conspiracy with the goal of distributing crack cocaine in the area of West 80th Street, West 83rd Street, and Detroit Avenue, because Defendants Caver and Abdullah were customers of

---

[7]There were other links between Defendants. For example, Defendant Caver cooperated extensively with Ralph Jones, who was also a repeat customer of Defendant Cloud and Defendant Abdullah. Walker was also a mutual business partner of all three defendants.

Hall and/or Defendant Cloud, even if they rarely interacted with each other. *See id*; *see also United States v. Kelly*, 849 F.2d 999, 1003 (6th Cir. 1988) (holding that a defendant who was involved only in distributing drugs in San Francisco was part of a single conspiracy with a common distributor who also operated in Washington and Los Angeles).

### 2. Prejudice

Even assuming, *arguendo*, that the evidence demonstrated only multiple conspiracies, we would still be compelled to affirm Defendants' convictions, because Defendants cannot demonstrate prejudice. Where the evidence demonstrates only multiple conspiracies, a defendant is prejudiced if the error of trying multiple conspiracies under a single indictment substantially influenced the outcome of the trial. *Kotteakos v. United States*, 328 U.S. 750, 765 (1956) ("The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."). The primary risk is the transference of guilt from defendants involved in one conspiracy to defendants in another conspiracy. *See id.* at 774; *Blackwell*, 459 F.3d at 762 ("[T]he inquiry into whether a variance constitutes reversible error focuses on whether a danger exists that the defendant was convicted based on evidence of a conspiracy in which the defendant did not participate." (citing *United States v. Mack*, 837 F.2d 254, 258 (6th Cir.1988))). This risk increases in direct proportion to the number of defendants, and the number of conspiracies demonstrated at trial. *See Kotteakos*, 328 U.S. at 766.

Defendants cannot demonstrate prejudice in this case. Assuming, *arguendo*, that multiple conspiracies existed, the evidence indicates that this case involved two conspiracies: One involving Morris, Hall, Defendant Cloud, Defendant Caver, and the various persons further down this distribution chain; and a separate conspiracy involving Morris, Hall, Defendant Cloud, Defendant Abdullah, and the various persons further down this distribution chain. Only three Defendants were tried, over a trial that lasted one week. *See Blackwell*, 459 F.3d at 762 (contrasting the eight conspiracies established in *Kotteakos*, 328 U.S. at 766, with the two conspiracies established in *Berger v. United States*, 295 U.S. 78 (1935)). Furthermore, Defendants were charged with conduct of approximately equal culpability; this was not a case where a defendant with a relatively minor role was forced to endure an extended trial where the bulk of the evidence did not pertain to him. And the witnesses at trial also were careful to specify what interactions they had had with each individual defendant. In light of these facts, we cannot say that, assuming that the evidence only demonstrated multiple conspiracies, Defendants were prejudiced by being tried together, regardless of whether the standard is plain error or harmless error.

### C.     SEVERANCE

Before trial began, Defendant Caver moved for severance. The trial court denied that motion, and Defendant Caver challenges this denial on appeal.[8] We review the district court's denial of severance for a clear abuse of discretion. *United States v. Beverly*, 369 F.3d 516, 534 (6th Cir. 2004).

Federal Rule of Criminal Procedure 8(b) provides for joinder of defendants in a criminal case:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in

---

[8]Defendant Caver properly renewed this motion at the close of evidence, and has thus preserved the issue for appeal. *See United States v. Sturman*, 951 F.2d 1466, 1476 (6th Cir. 1991).

one or more counts together or separately. All defendants need not be charged in each count.

The exception to this rule is stated in Federal Rule of Criminal Procedure 14(a), which provides that "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may . . . sever the defendants' trials."

"[A] strong policy presumption exists in favor of joint trials when charges will be proved by the same evidence and result from the same acts." *Beverly*, 369 F.3d at 534 (citing *United States v. Hamilton*, 689 F.2d 1262, 1275 (6th Cir. 1982)). Society has an interest in speedy and efficient trials. *See United States v. Moore*, 917 F.2d 215, 220 (6th Cir. 1990). Separate trials produce additional labor for judges and juries, which results from the unnecessary repetition of evidence and trial procedures. Moreover, the risk of prejudice to defendants in a joint trial is presumably low, because "juries are presumed capable of sorting evidence and considering separately each count and each defendant." *United States v. Welch*, 97 F.3d 142, 147 (6th Cir. 1996). These considerations are overcome "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable determination about guilt or innocence." *Murr v. United States*, 200 F.3d 895, 904 (6th Cir. 2000) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). Thus, "a defendant seeking severance at trial bears a strong burden and must demonstrate substantial, undue, or compelling prejudice." *United States v. Davis*, 177 F.3d 552, 558 (6th Cir. 1999).

Defendant Caver argues that this substantial, undue, or compelling prejudice flows from two sources: (1) testimony that suggested that Defendants Cloud and Abdullah engaged in more drug transactions, and transactions involving larger quantities of drugs; and (2) evidence of violent threats by Defendants Cloud and Abdullah against government witnesses.

We conclude that the district court did not abuse its discretion in refusing to sever Defendant Caver. While we acknowledge the possibility that Defendant Caver might have suffered some slight disadvantage from being tried along with defendants who were higher up in the distribution chain and more frequently employed threats of violence, this disadvantage is insufficient to overcome the strong presumption that the jury is capable of sorting through the evidence. *See Welch*, 97 F.3d at 147. As stated earlier, the government witnesses exhibited a relatively great degree of precision in delineating the transactions that they engaged in with the individual defendants.[9] And the difference between the quantity purchased by Defendant Cloud and Defendant Caver was relatively small: Hall suggested that he and Cloud collectively would buy upwards of a quarter-kilogram, which is equal to approximately nine ounces shared between two people; evidence suggested that Defendant Caver would purchase one-ounce quantities. Although the evidence at trial that tended to show that Defendants Abdullah and Cloud made threats to witnesses also created a small risk of prejudice, this risk of prejudice is ameliorated under these circumstances. Many of the threats came before the jury by way of letters written by Defendant Cloud, yet the jury had letters written by Defendant Caver before it as well, and his letters were not threatening in tone.[10] This diminishes the chances that a jury would improperly impute guilt to Defendant Caver, let alone the "substantial, undue, or

---

[9] We note that, in fact, the jury does appear to have drawn a distinction between the defendants in this case: It found Defendants Caver and Abdullah guilty of conspiracy to possess with intent to distribute at least 500 grams, but less than 1.5 kilograms of crack cocaine, while it found Defendant Cloud guilty of conspiracy to possess with intent to distribute 1.5 or more kilograms of crack.

[10] These letters are discussed extensively in Part D.2, *infra*.

compelling prejudice" required to justify a severance.[11] *See Davis*, 177 F.3d at 558. The district court did not abuse its discretion in denying Defendant Caver's motion to sever.

## D.   EVIDENTIARY RULINGS

### 1. Hearsay evidence

Defendant Caver argues that the district court improperly admitted hearsay testimony against him. Over Defendant Caver's objection, the district court admitted the testimony of officer Schroeder, a Cleveland Police Officer, who testified that on March 18, 2003, Sergeant Dvorak briefed police officers that "there was a male by the name of Calvin Caver that was responsible for dealing a lot of drugs, crack cocaine, in the West 80th and Detroit Areas." J.A. at 630. This court reviews the district court's decision to admit hearsay evidence *de novo*. *Barnes v. City of Cincinnati*, 401 F.3d 729, 742 (6th Cir.), *cert. denied*, 126 S. Ct. 624 (2005). The improper admission of hearsay evidence "is harmless error 'unless it is more probable than not that the error materially affected the verdict.'" *Id.* (quoting *United States v. Hernandez*, 227 F.3d 686, 696 (6th Cir. 2000)).

Hearsay is defined by the Federal Rules of Evidence as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay evidence is generally inadmissible, subject to the exceptions set forth in the Federal Rules of Evidence. *See* Fed. R. Evid. 802.

At trial, the district court admitted Schroeder's testimony, reasoning that it was background information. Background information that explains how law enforcement came to be involved with a particular defendant is not hearsay, because it is not being offered for the truth of the matter asserted. *United States v. Aguwa*, 123 F.3d 418, 421 (6th Cir. 1997). Instead, background information may be admitted to show the effect of hearing that information upon the testifying witness, who subsequently, as a result of the background information, acquires the knowledge that provides the foundation for the witness's testimony. *See United States v. Evans*, 883 F.2d 496, 501 (6th Cir. 1989) (background information is admissible to "construct the sequence of events leading up to the drug transaction").

In this case, the statement at issue, "that a male by the name of Calvin Caver was responsible for dealing a lot of drugs," was not background information because the statement played no part in the causal sequence of events leading up to the admissible testimony based on Schroeder's personal observations. Later in the evening, after Dvorak had briefed Schroeder and other police, Schroeder was involved in the surveillance of Defendant Caver's car, which led to Defendant Caver's arrest that same night. Schroeder watched the black Dodge Intrepid that Defendant Caver was driving as the driver made what appeared to be a drug deal through the passenger window, and then the car drove to a different location where another individual entered the black Intrepid briefly before driving away in a separate car. But Schroeder did not know what Defendant Caver looked like, and had no reason to suspect that it was Defendant Caver driving the black Intrepid. The information Schroeder received from Dvorak, therefore, was not background information to Schroeder's participation in Defendant Caver's arrest; it was merely a coincidence that Schroeder was briefed about Defendant Caver the same night that he was involved in arresting Defendant Caver. Because Dvorak's statement was not background information, it was inadmissible hearsay, as there was no proper purpose for which it was offered.

---

[11] Defendant Caver's assertion that trying him separately would require no extra resources is plainly incorrect. Along with the additional labor that would be required from a judge and jury, here the witnesses overlapped significantly–of 26 witnesses called, at least 20 of them offered testimony that was relevant to the prosecution of Defendant Caver.

Although the district court erred in admitting Schroeder's hearsay testimony, this error does not require reversal because it is not more probable than not that the error materially affected the verdict. *See Barnes*, 401 F.3d 742. The record was replete with direct evidence that Defendant Caver was dealing drugs in the West 80th Street and Detroit Avenue area. The evidence showed that Defendant Caver was arrested twice for dealing crack cocaine in the amounts of 12.04 and 2.93 grams, and also included numerous coconspirators' testimony to the effect that Defendant Caver was dealing a large volume of crack cocaine throughout 2002 and 2003. In light of this evidence, we hold that the district court's error in admitting Schroeder's testimony was harmless.

### 2. Defendants Cloud's and Caver's letters

Defendants Cloud and Caver next argue that their convictions should be vacated because the district court admitted various letters that they wrote to coconspirators. Defendants contend that the letters were inadmissible because their admission violated Federal Rule of Evidence 403. We review the district court's evidentiary rulings under Rule 403 for abuse of discretion. *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993). The district court has "very broad" discretion in weighing the evidence under Rule 403. *United States v. Newsom*, 452 F.3d 593, 603 (6th Cir. 2006) (quoting *United States v. Vance*, 871 F.2d 572, 576 (6th Cir.1989)). Moreover, because Defendants did not object to the admission of the letters at trial, we review only for plain error. *Id* at 602.

Rule 403 governs whether evidence that is relevant under Federal Rule of Evidence 401 is admissible. Rule 403 states that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Here, Defendants contend that the prejudicial effect of the letters substantially outweighed their probative value. We note that "[u]nfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to the evidence which tends to suggest [a] decision on an improper basis." *Newsom*, 452 F.3d at 603 (quoting *Bonds*, 12 F.3d at 567) (alteration in original).

### a. Defendant Caver

The district court admitted five letter letters from Defendant Caver to Ralph Jones, exhibits 41, 42, 46, 47, and 48; one letter from Defendant Caver to Wilson, exhibit 50; and one letter from Defendant Caver to Hall, exhibit 51. Exhibit 41 states Defendant Caver's hope that Jones will sign an affidavit stating that Jones and Defendant Caver did not engage in any drug transactions together. Exhibit 42 expresses Defendant Caver's happiness in being able to see Jones, and Defendant Caver's belief that Jones would have a better chance at trial than Defendant Caver. Exhibit 46 asks Jones for information as to what he knows concerning the testimony he might proffer, so that Defendant Caver may prepare his defense. Exhibit 47 expresses Defendant Caver's opinion that Jones should wait before pleading guilty, and that Jones should not testify against Defendant Caver. Exhibit 48 instructs Jones not to listen to his lawyer. Exhibit 50, to Wilson, summarizes the indictment for Wilson, contains an affidavit for Wilson to sign stating that Wilson did not conspire with any of the persons indicted, and expresses Defendant Caver's belief that Wilson would get a minimal amount of prison time if he went to trial. Exhibit 51, translated from a crude code, asks Hall if he admits that some of his statements are lies, but instructs Hall not to answer that question, and goes on to state that the letter is just about saying hello.

The evidence was all relevant to some degree. The indictment against Defendant Caver included an obstruction of justice specification. *See* U.S. Sentencing Guidelines Manual § 3C1.1 (2004) (hereinafter "U.S.S.G.") (defining obstructing or impeding the administration-of-justice specification and directing a sentencing increase of two levels). Exhibits 41 and 50, which request affidavits, are unquestionably relevant to this specification. Although the connection is less direct,

the other letters to Jones can be construed as part of an on-going attempt to influence Jones to change his legal strategy for Defendant Caver's benefit, and thus they are relevant under Rule 401. *See Old Chief v. United States*, 519 U.S. 172, 178-79 (1997) (discussing relevance). As for the letter to Hall, the relevance is still more attenuated, but we cannot say that this letter does not have "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* at 178 (quoting Fed. R. Evid. 401). The letter does ask Hall to admit that some of his statements are "lies," which could be fairly interpreted as an attempt to convince Hall not to testify against Defendant Caver.

The question then becomes whether the district court abused its discretion in concluding that the probative value outweighed the prejudicial effect. We cannot conclude that it so clearly did as to rise to the level of plain error. Generally, the tone of Defendant Caver's letters was congenial, and the letters were consistently nonthreatening. The only improper prejudice suggested by Defendant Caver is that the letters used foul language and derogatory terms for counsel and the criminal justice system. Any improper prejudice stemming from these bases is low, at least when compared to the prejudice that was present in cases where an appellate court concluded that the district court abused its discretion under Rule 403. *See, e.g.*, *id.* at 191 (concluding that prejudice from a felony conviction for assault outweighed probative value in trial for assault and being a felon in possession of a firearm where defendant was willing to stipulate to the fact that he had a prior felony conviction); *Newsom*, 452 F.3d at 604 (prejudice from defendant's tattoos of "thug life" and depiction of an armed man outweighed any conceivable probative value). Thus, although the probative value of some of the letters was low, so was the unfair prejudice. We cannot conclude that admitting the evidence was plain error.

### b. Defendant Cloud

The district court admitted nine letters against Defendant Cloud.[12] Exhibit 29 is a letter to an unknown recipient (it is addressed to "family") seized as a result of Defendant Cloud's October 3, 2003 arrest. It expresses anger towards the recipient for sharing information with Defendant Cloud's mother, and Defendant Cloud's readiness to retaliate should the recipient cross Defendant Cloud. Exhibit 31 is a letter to Morris, where Defendant Cloud expresses his anger with Morris for cooperating with the government. Defendant Cloud does not threaten Morris, but rather pleads for Morris not to testify against him. He also asks Morris to sign an affidavit indicating that Morris had not engaged in drug transactions with Defendant Cloud. Exhibit 33 is a letter addressed to Collier (although Collier never received it). The letter contains thinly-veiled threats that Collier would place his family in danger by cooperating with the government. Exhibit 34 is a letter to Walker, where Defendant Cloud calls Walker a "snitch" and a "rat." Exhibits 39 and 40 are letters to Hall where Defendant Cloud expresses his anger at Hall for cooperating with the government. Exhibit 44 is another letter to Walker where Defendant Cloud expresses his dissatisfaction with Walker's cooperation with the government. Exhibit 45 is a letter to Ralph Jones in which Defendant Cloud states that he signed Jones's affidavit, so now Jones should sign Defendant Cloud's affidavit.

The indictment also contained an obstruction of justice specification against Defendant Cloud. Exhibits 31, 33, and 45 are all clearly relevant to this specification. *See* U.S.S.G. § 3C1.1. Exhibits 29, 34, 39, 40, and 44 are less relevant, although they could still fairly be construed as an attempt to unlawfully influence government witnesses. *See id.* at cmt. 4(a). The question then becomes whether

---

[12]In the list of exhibits Defendant Cloud alleges to be prejudicial, he also includes a letter from Hall to Defendant Cloud, exhibit 35. However, because Defendant Cloud makes no argument with respect to that specific letter, and because a letter *to* Defendant Cloud is inconsistent with his theory of prejudice, we need not specifically consider this letter. *See Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005) (issues raised in a perfunctory manner are waived). We note, however, that there is nothing in the letter's content to suggest that considering it would alter our analysis.

the unfair prejudice substantially outweighs the probative value. As an initial matter we note that, with respect to the threats, the probative value rises in tandem with the unfair prejudice–the more serious and imminent the threat, the greater the possibility that the jury convicted Defendant Cloud because he is an individual who makes violent threats (as opposed to being a conspirator), but the more probative the letter was to the obstruction of justice specification. Defendant Cloud argues, however, that the letters were nonetheless unfairly prejudicial, because they contained street jargon, profanity, and painted an unfavorable picture of him. While Defendant Cloud is surely correct that the letters interjected some risk of unfair prejudice, we cannot say, given the broad discretion afforded to the district court, that it was a plain error to admit them. *See Newsom*, 452 F.3d at 603.

Moreover, even assuming that it was plain error, we would still be compelled to affirm Defendant Cloud's conviction. Before this Court will reverse for plain error, the defendant must meet the burden of showing that the error "must have affected the outcome of the District Court proceedings." *United States v. Thomas*, 11 F.3d 620, 630 (6th Cir. 1993) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). Given the substantial evidence in the record supporting Defendant Cloud's conviction, we cannot conclude that Defendant Cloud has demonstrated that the error, if any, affected the outcome.

## E.  IMPROPER STATEMENTS BY WITNESSES

Defendants allege that several improper statements by witnesses at trial required the district court to grant a mistrial, and that its failure to do so was erroneous. We review the district court's denial of a motion for a mistrial for abuse of discretion. *United States v. Martinez*, 430 F.3d 317, 336 (6th Cir. 2005). In considering whether improper statements warrant granting a mistrial, this Court evaluates five factors:

> (1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether a limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant.

*Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003) (citing *United States v. Forrest*, 17 F.3d 916 (6th Cir. 1994)). In making this inquiry, the "primary concern is fairness to the defendant." *Forrest*, 17 F.3d at 919. With this framework in mind, we now turn to the specific statements.

### 1. Walker's statement

On direct examination, the government was allegedly attempting to elicit testimony about a quarter-kilogram of crack cocaine that Defendant Cloud's girlfriend flushed down the toilet on July 4, 2003. The following exchange occurred between the prosecution and Walker:

Q. Did any of your transactions occur [at Cloud's girlfriend's house]?

A. Yes.

Q. And can you tell us about that, Mr. Walker?

A. I would call him and tell him I'm on my way over there, and I would go up there.

Q. Did you have a conversation with Fred Cloud about a Fourth of July incident in 2003?

A. Yes.

Q. Can you tell use about that?

A.  Oh, about when, when his – he tried to spray gasoline over his baby's mother's house.

J.A. at 1656-57.  Defense counsel objected, and the court stated, "there was no reason for that, was there?  The jury will disregard that last answer."  J.A. at 1657.  Defendant Cloud later moved for a mistrial, which the district court denied.

Applying the factors from *Forrest*, we conclude that the district court did not abuse its discretion in denying a mistrial.  The government was in the process of questioning Walker on a legitimate line of inquiry, and there is nothing in the record to suggest that they solicited the remark. The line of questioning was also reasonable, as it was aimed at eliciting admissible testimony, specifically, the amount of drugs involved.  The district court immediately instructed the jury to disregard the testimony, and Defendant Cloud's counsel asked that no other instruction be given to the jury on the matter.  There was also no indication of bad faith on the part of the government; in fact, Defendant Cloud's counsel stated that he "certainly [didn't] believe the government would deliberately [elicit such testimony]."  J.A. at 1666.  Finally, as discussed above, the evidence against Defendant Cloud was substantial.  In sum, all factors cut in favor of the government, and the court did not abuse its discretion in not granting a mistrial.

### 2.  Hall's statement

On direct examination, the government was asking Hall about the activities in which he had seen Defendant Abdullah participate.  The following exchange took place:

Q.  What did you see Mr. Abdullah doing in that time frame, 2002 and 2003, in the neighborhood?

A.  Selling crack.

Q.  And how often would you see that?

A.  It was real often.  I had just got out of jail in 2002, so in 2003 – I got out of jail in 2002, September 5 – September 19 of '02.  And when I got out there, he was really out there grinding. Then he went to jail.  Then when he got out of jail –

Q.  Just what you saw, Mr. Hall, out there.

J.A. at 1086-87.  Defendant Abdullah's attorney requested a side-bar, where he moved for a mistrial. The district court denied the motion.

Applying the factors from *Forrest*, the district court did not abuse its discretion in denying Defendant Abdullah's motion for a mistrial.  At the side-bar, Defendant Abdullah admitted that the remark was unsolicited–in fact, the government cut Hall off immediately.  The government's line of questioning, about what direct knowledge its witness had of Defendant Abdullah's drug dealing, was reasonable, relevant questioning not likely to result in information that was improperly prejudicial. Although no limiting instruction was given, Defendant Abdullah's trial strategy was to avoid calling attention to the statement.  There is a paradoxical impossibility in asking an individual not to think about a particular fact, because that very request calls attention to the fact that is to be ignored.  *See Ferguson v. Knight*, 809 F.2d 1239, 1243 (6th Cir. 1987).  This course of not drawing attention to the statement may be perfectly sound from a tactical standpoint, but, once undertaken, any objection to

the lack of a limiting instruction should fall on deaf ears.**[13]** There is also no indication of bad faith on the part of the government. Finally, there was substantial evidence against Defendant Abdullah. All factors favor the government; the district court did not abuse its discretion in denying Defendant Abdullah's motion for a mistrial.

### 3. Morris's statement

During cross examination, counsel for Defendant Abdullah asked Morris in which city he lived. The following exchange took place:

Q. Did you own the home you were living in?

A. No.

. . .

Q. And where was it?

A. That's irrelevant.

Q. What city was it in?

A. That's irrelevant.

[Defendant's Abdullah's counsel]. Your honor, would you direct the witness to answer the question please? He's making legal determinations.

[Morris]. So they can come back and have somebody kill my daughter and my kids?

J.A. at 1005.

Defendant Cloud and Defendant Caver argue that the court should have granted a mistrial in response to this statement. However, as neither Defendant objected at trial, we review only for plain error. *United States v. Kincaide*, 145 F.3d 771, 781 (6th Cir. 1998).

Applying the *Forrest* factors, we conclude that the court's failure to *sua sponte* declare a mistrial does not amount to plain error. Because the remark occurred on cross examination, whether the government solicited the remark is inapplicable, as is the question of whether the government's line of questioning was reasonable. There was no indication of bad faith by the government, and there was substantial evidence against Defendant Cloud and Defendant Caver adduced at trial. The fact that there was no limiting instruction, on the other hand, favors Defendants, but this alone is not sufficient to carry Defendants' burden of plain error. We conclude that no plain error occurred.

---

**[13]**We note that Defendant Abdullah's counsel did not specifically ask the court not to issue a limiting instruction, but this message was clear from Defendant Abdullah's counsel's conduct and the discussion he had with the district judge. First, Defendant Abdullah's counsel intentionally waited for Hall's testimony to proceed to a different matter before calling a side-bar to move for a mistrial, so that the jury would not link the side-bar to the comment, which would call attention to the comment. Second Defendant Abdullah's counsel stated "I didn't want to call attention to [the comment] when it was said." J.A. at 1087. Third, Defendant Abdullah's counsel did not ask for a limiting instruction after his motion for a mistrial was denied or otherwise. Under these circumstances, we conclude that it was counsel's strategy that the district court not issue a limiting instruction.

### 4. Hall's statements

Defendant Cloud additionally objects to two statements made during the direct examination of Hall. Hall, being asked how he recognized an undercover police car, responded that "I have got arrested with Fred Cloud before." J.A. at 1093. Defendant Cloud moved to strike, and the motion was sustained. Defendant Cloud did not move for a mistrial. Later, the government asked Hall if he recalled Defendant Cloud selling drugs in the neighborhood during the 2002 to 2003 time frame. Hall responded, "Well, in 2002 when I got out of jail, [Defendant Cloud] was on house arrest." J.A. at 1126. Defendant Cloud again did not make a motion for a mistrial. We thus review for plain error. *Kincaide*, 145 F.3d at 781.

We conclude that the district court did not commit plain error in failing to *sua sponte* declare a mistrial. These remarks were unsolicited. The government's questioning, which related to events that were relevant to the conspiracy, was reasonable. There was no indication of bad faith on the part of the government, and the evidence against Defendant Cloud was substantial. The only *Forrest* factor that favors Defendant Cloud is the failure of the district court to give a limiting instruction. This failure does not amount to plain error.

## F.     JURY INSTRUCTIONS

Defendants challenge two jury instructions on appeal. First, Defendant Caver objects to the district court's failure to instruct the jury about multiple conspiracies.[14] Second, Defendant Caver and Cloud object to the district court's instruction that "[a] defendant found guilty of conspiracy is accountable for all quantities of drugs for which he was directly involved, and all reasonably foreseeable quantities." J.A. at 1916. Defendants allege that "directly involved" and "reasonably foreseeable" required elaboration.

### 1. Multiple Conspiracies

"[W]hen the evidence is such that the jury could within reason find more than one conspiracy, the trial court should give the jury a multiple conspiracy instruction." *United States v. Warner*, 690 F.2d 545, 551 (6th Cir. 1982). A defendant is entitled to reversal of a conviction based on the district court's failure to give a requested jury instruction if "(1) the instructions are correct statements of the law; (2) the instructions are not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the defendant's theory of the case." *United States v. Newcomb*, 6 F.3d

---

[14]The multiple conspiracy instruction proposed by Defendant Caver reads:

Where persons have joined together to further one common unlawful design or purpose, a single conspiracy exists. By way of contrast, multiple conspiracies exist where there were separate unlawful agreements to achieve distinctive purposes. If you determine that the evidence presented could possibly be construed only as supporting the existence of multiple conspiracies, you may consider only the evidence regarding a specific defendant's action or actions of individuals belonging to the conspiracy to which the defendant also belonged. That is to say, it would be improper to return a guilty verdict with respect to a defendant based on evidence relating to acts committed by someone belonging to a conspiracy of which the defendant was not a member. In determining whether the evidence showed single or multiple conspiracies, you must bear in mind the essence of the crime of conspiracy's agreement.

Mere presence at the scene of an alleged transaction or event, mere association with person involved in a criminal enterprise, or mere similarity of conduct among various persons and the fact that they have associated with each other and may have assembled together and discussed common names and interests does not necessarily establish proof of the existence of a conspiracy. Also a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some object or purpose of a conspiracy, does not thereby become a conspirator.

1129, 1132 (6th Cir. 1993). If a defendant suffers no actual prejudice, however, reversal is not required. *United States v. Paulino*, 935 F.2d 739, 748 (6th Cir. 1991), *superceded by statute on other grounds*, U.S.S.G. § 3B1.1.

We need not decide whether the evidence at trial was such that the jury could have found multiple conspiracies, however, because Defendant Caver cannot demonstrate prejudice. As in the context of a variance, the primary risk associated with the failure to give a multiple conspiracy instruction is the transference of guilt from defendants involved in one conspiracy to defendants in another conspiracy, such that a defendant is convicted for a conspiracy for which he was not indicted. *Cf. United States v. Blackwell*, 459 F.3d 739, 762 (6th Cir. 2006) (citing *United States v. Mack*, 837 F.2d 254, 258 (6th Cir.1988)).

As we found in our analysis of whether a variance existed, Defendant Caver cannot demonstrate prejudice in this case. At most, the government's evidence demonstrated two conspiracies, the trial involved only three defendants and lasted only one week, and a significant part of the evidence produced at trial supported a determination of guilt on the part of Defendant Caver. *See United States v. Fultz*, Nos. 95-5722, 95-5723 & 95-5822, 1996 WL 273736, *2 (6th Cir. May 22, 1996) (unpublished disposition) (finding high risk of prejudice where "the great bulk of evidence presented related to the activities of individuals other than defendants"). Moreover, the government's witnesses clearly demarcated their interactions with each individual defendant. In light of this evidence, we cannot say that Defendant Caver was prejudiced by the district court's failure to give Defendant Caver's proposed multiple conspiracy instruction.

### 2. Drug-quantity instruction

Defendants Caver and Cloud object to the district court's instruction that "[a] defendant found guilty of conspiracy is accountable for all quantities of drugs for which he was directly involved, and all reasonably foreseeable quantities."[15] J.A. at 1916. Because Defendants failed to object to this instruction at trial, we will reverse only for plain error. *Thomas*, 11 F.3d at 630. Jury instructions do not rise to the level of plain error unless there is a "finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *Newsom*, 452 F.3d at 605.

Defendants argue that the jury was provided with no standards as to what constituted being "directly involved" or what quantities of drugs were "reasonably foreseeable." These arguments lack merit. "Directly involved" and "reasonably foreseeable" are common sense terms, requiring no elaboration. The district court's instructions were not erroneous, and they certainly did not rise to the level of plain error.

## G.    SENTENCING ISSUES

### 1. Eighth Amendment challenge

Defendant Caver argues that his sentence violates the Eighth Amendment because, according to Defendant Caver, the imposition of a mandatory term of life without release constitutes cruel and unusual punishment. We review a challenge to a sentence under the Eighth Amendment *de novo*.

The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Section 841(b)(1)(A) of Title 21 of the United States Code mandates a life sentence without release if a defendant who has two or more prior felony drug convictions is guilty of violating § 841(a), and the crime involves fifty grams of crack

---

[15]Defendant Cloud incorporates Defendant Caver's argument by reference.

cocaine or more. Since Defendant Caver meets these qualifications, the district court applied the statute and sentenced Defendant Caver to life in prison without release.

Defendant Caver's Eighth Amendment claim is squarely foreclosed by this court's decision in *United States v. Hill*, 30 F.3d 48, 51 (6th Cir. 1994). There we held that defendant Hickey's mandatory sentence, which was life imprisonment without release pursuant to the same statute, was constitutional. Defendant Caver cannot differentiate *Hill*. His Eighth Amendment challenge therefore fails.[16]

## 2. Review for reasonableness

Defendant Cloud contends that his thirty-year sentence, which falls at the bottom of the applicable Guidelines range, is unreasonable. We review the sentence imposed by the district court for reasonableness. *United States v. Booker*, 543 U.S. 220, 261 (2005). We note that a sentence within the guidelines is presumptively reasonable, and the defendant bears the burden of rebutting this presumption. *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006), *petition for cert. filed*, (U.S. July 11, 2006) (No. 06-5275). In evaluating reasonableness, the focus of our inquiry is on the factors set forth in 18 U.S.C. § 3553(a). *Booker*, 543 U.S. at 261 ("Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."). The § 3553(a) factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the appropriate advisory guideline range; (5) any other pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

*United States v. Vonner*, 452 F.3d 560, 565 (6th Cir. 2006), *reh'g en banc granted*, (Oct. 12, 2006) (No. 05-5295) (quotation marks omitted) (quoting 18 U.S.C. § 3553(a)).

"[A] district court's mandate is to impose 'a sentence sufficient, but not greater than necessary, to comply with the purposes' of section 3553(a)(2)." *United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006). In order for a sentence to be reasonable, it must be both substantively reasonable and procedurally reasonable. *United State v. Collington*, 461 F.3d 805, 808 (6th Cir. 2006). A sentence is procedurally unreasonable if "the district judge fails to 'consider' the applicable Guidelines range or neglects to 'consider' the other factors listed in 18 U.S.C. § 3553(a), and instead simply selects what the judge deems an appropriate sentence without such required consideration." *Id.* (citing *United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005), *cert. denied*, 126 S. Ct. 1110 (2006)). Additionally, the district court, in order to facilitate appellate review, must articulate its reason for choosing a particular sentence, and it must specifically address any argument raised by the defendant at sentencing. *United States v. Richardson*, 437 F.3d 550, 554 (6th Cir. 2006). A sentence is "substantively" unreasonable if the district court "select[s] the sentence arbitrarily, bas[es] the sentence on impermissible factors, fail[s] to consider pertinent § 3553(a) factors or giv[es] an

---

[16]Defendant Cloud adopts this argument by reference, challenging the constitutionality of his thirty-year term of incarceration. We reject Defendant Cloud's argument, as the constitutionality of his thirty-year term follows *a fortiori* from our holding that Defendant Caver's life sentence is constitutional.

unreasonable amount of weight to any pertinent factor." *Collington*, 461 F.3d at 808 (citing *Webb*, 403 F.3d at 305) (alternations in original).

Defendant Cloud makes three arguments in support of his claim that his sentence is unreasonable. First, Defendant Cloud argues that the district court failed to properly articulate its consideration of the § 3553(a) factors. Second, Defendant Cloud argues that the failure of the district court to consider the disparity between the punishment for crack cocaine versus powder cocaine renders his sentence unreasonable. Finally, Defendant Cloud argues that the fact that the jury attributed a higher drug quantity to him than to Defendants Caver or Abdullah makes his sentence unreasonable.[17] We address each argument in turn.

A review of the record indicates that the district court gave a thorough explanation of its reasons for selecting Defendant Cloud's sentence. The court explained that Defendant Cloud was a young man with a long criminal history. He had two juvenile convictions and six adult convictions, four of which were felonies, and most of which were drug-related. Defendant Cloud was also deemed a career offender, because he was released from prison, but "continued to engage in serious criminal conduct." J.A. at 2066-67. The district court found that Defendant Cloud was a high risk to the community, that he had a potential for recidivism, and that the jury had found him more culpable than Defendants Caver and Abdullah. The district court also noted the seriousness of the charge. Nevertheless, the district court considered the high end of the Guidelines range inappropriate, and instead sentenced Defendant Cloud to the bottom of the range, 360 months. The district court found that "360 months is appropriate to meet the goals of punishment, deterrence, and safety to the community." J.A. at 2067. The court clearly considered the § 3553(a) factors. This record indicates that Defendant Cloud's sentence is reasonable.

Defendant Cloud's second argument is that the 100:1 crack cocaine ratio–that is, the fact that a given weight of crack cocaine (e.g., 500 grams of crack cocaine) carries the same Guidelines sentencing level as 100 times that amount of powder cocaine (e.g., 50,000 grams of powder cocaine)[18]–is no longer reasonable under *Booker*. Defendant Cloud points to nothing about the particular facts of his case that make his sentence unreasonable; rather, he argues that, post-*Booker*, the 100:1 ratio is per se unreasonable. We disagree. Defendant Cloud, in effect, asks this court to not find *his* sentence unreasonable, as we are authorized to do by *Booker*, 543 U.S. at 261, but rather to declare a portion of the Sentencing Guidelines unreasonable under all circumstances. Were we to act upon Defendant Cloud's suggestion, we would essentially be exercising legislative power. *Booker* does not authorize this. *See United States v. Wallace*, 458 F.3d 606, 611 (7th Cir. 2006) ("Only after computing the guidelines range using the correct 100:1 ratio does the district judge have discretion to impose a sentence that is above or below that range . . . . [R]easonableness is something that must be assessed at retail; wholesale conclusions that are nothing but disagreements with the guidelines are impermissible."). Thus, while a departure from the 100:1 ratio may well be reasonable in a particular case, applying the ratio does not, *ipso facto*, make a sentence unreasonable under existing case law. This is so even though we as a panel might disagree with the 100:1 ratio or the rationale for it. Because Defendant Cloud has not demonstrated that the 100:1 ratio was unreasonable in his case, his challenge to his sentence on this ground must fail.

Defendant Cloud's final argument is that his sentence is unreasonable because the jury attributed a higher quantity of drugs to him than to Defendants Caver or Abdullah. This argument lacks merit. The simple answer is that the evidence presented at trial was not inconsistent with the

---

[17] The jury concluded that the amount of drugs attributable to Defendants Abdullah and Caver under the conspiracy charge was at least 500 grams of crack cocaine but less than 1.5 kilograms of crack cocaine; the jury found greater than 1.5 kilograms of crack cocaine attributable to Defendant Cloud under the conspiracy charge.

[18] *See* U.S.S.G. § 2D1.1.

jury's verdict. A rational jury could have easily determined from the evidence at trial that the quantity of drugs attributable to Defendant Cloud was greater than that attributable to Defendants Caver or Abdullah. This court will not set aside a verdict supported by the evidence, which is what Defendant Cloud is in effect asking us to do. Thus, the fact that the jury attributed more drugs to Defendant Cloud does not provide a basis for finding Defendant Cloud's sentence unreasonable.

**H.    INEFFECTIVE ASSISTANCE OF COUNSEL**

Defendant Cloud argues that he was deprived of his Sixth Amendment right to effective assistance of counsel. There is a preference for raising ineffective assistance of counsel claims on collateral review under 28 U.S.C. § 2255. *Massaro v. United States*, 538 U.S. 500, 504-05 (2003). Although there is a narrow exception where "trial counsel's ineffectiveness is so apparent from the record that appellate counsel will consider it advisable to raise the issue on direct appeal," *id.* at 508, we do not consider this to be one of those cases. Defendant Cloud points to six errors on appeal: (1) the failure to object to Hall's reference to Defendant Cloud's house arrest; (2) the failure to object to Morris's improper statement; (3) the failure to object to the admission of the letters authored by Defendant Cloud; (4) the failure to make "comprehensive objections at sentencing;" (5) the failure to seek severance; and (6) the failure of trial counsel to object at sentencing. Because we believe that the issues would benefit from further factual development, we decline to adjudicate them today. *See United States v. Bradley*, 400 F.3d 459, 462 (6th Cir.), *cert. denied*, 126 S. Ct. 145 (2005).

**CONCLUSION**

For the foregoing reasons, we **AFFIRM** Defendants' convictions and sentences.