NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0025n.06

**Nos. 09-5200, 09-5201**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

**Jan 12, 2011**

LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,

      **Plaintiff-Appellee,**

v.

ANTHONY LABRON DAVIS;
RUFFINO TELLEZ-ARAUJO,

      **Defendants-Appellants.**

                          /

**ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE**

BEFORE:     SILER, CLAY, and GIBBONS, Circuit Judges.

    **CLAY, Circuit Judge.**     Defendant Anthony Labron Davis appeals convictions for conspiring to intentionally distribute, and conspiring to knowingly and intentionally possess 500 grams or more of a mixture and substance containing a detectable amount of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and of knowingly and intelligently possessing with intent to distribute, and distributing 500 grams or more of a mixture and substance containing a detectable amount of cocaine in violation of 21 U.S.C. § 841(a)(1), and 18 U.S.C. § 2.

    Defendant Ruffino Tellez-Araujo appeals his conviction for conspiring to distribute, or conspiring to possess with intent to distribute a mixture or substance containing a detectable amount of cocaine in the amount of 500 grams or more in violation of 21 U.S.C. §§ 841(a)(1) and 846.

    For the reasons stated below, we **AFFIRM** the district court's judgment.

## I. BACKGROUND

In 2003, as part of its investigation of a Nashville-based drug distribution conspiracy, Drug Enforcement Administration ("DEA") agents obtained a Title III court-authorized wiretap of the phone lines of Luis Mondragon-Bibiano, known as Chapparo, and Edgar Rayo-Navarro, known as Arturo. During the course of their investigation, DEA agents intercepted some 4,000 phone calls. While listening to these conversations, which were entirely in Spanish, DEA agents identified the voices of three speakers: Chapparo, Arturo, and a third speaker, referred to as El Negro. Based on information they obtained from the wiretapped calls, DEA agents intercepted over a million dollars in drug money, and 55 kilograms of cocaine.

In October 2008 DEA agents arrested several members of the Tennessee drug conspiracy in the Middle District of Tennessee, including Chapparo, Arturo, and Defendant Tellez. Although Tellez was initially arrested for immigration violations, ten months after his arrest Chapparo and Arturo entered into plea deals with the government, and identified Tellez as El Negro. Tellez was subsequently indicted for drug conspiracy charges relating to the drug conspiracy.

Defendant Davis was arrested based on three intercepted calls in which he was identified as a speaker, and information obtained from alleged co-conspirators. According to several alleged co-conspirators in the drug conspiracy, on a trip from Memphis, Tennessee to Nashville, Tennessee, Davis and Arturo were introduced to each other by alleged co-conspirator Kai Tyshawn Davis, Davis' nephew. After this meeting, Arturo agreed to provide Davis with cocaine for distribution in Memphis by Davis and alleged co-conspirator Allen Conner. Conner was subsequently arrested with a kilogram of cocaine, which he stated he received from Davis.

2

Based on these facts, Defendants Tellez and Davis were indicted for conspiring to possess with intent to distribute, and conspiring to distribute five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Defendant Davis was also indicted for possessing with intent to distribute, and distributing 500 grams or more of cocaine in violation of 21 U.S.C. § 841(a)(1). Defendants' consolidated jury trial began on July 22, 2008.

On the third day of trial, two jurors, Juror Number 12 and Juror Number 3, sent a note to the court stating that they had contact with Davis in a hallway near the elevators outside of the jury room. The note indicated that Davis did not speak to the jurors, but that the encounter "freaked [them] out . . . and made [them] feel uncomfortable because [they] had to pass him in the doorway." Defendants immediately moved for a mistrial based on jury contact, and Tellez also moved for a severance. The district court denied Defendants' motions.

The following day, Defendants moved for reconsideration of their motions for mistrial and severance. The district court held a hearing to determine whether Davis' contact with the jurors warranted a new trial. At the hearing Juror Number 12 stated that the encounter "made [her] feel uncomfortable" because Davis was "right in [her] face." She also stated that she had discussed the matter with the other jurors. However, she indicated that her encounter with Davis would not impact her ability to decide the case impartially.

Juror Number 3 stated that he thought the note's statement that the jurors were "freaked out" by the encounter was exaggerated. However, he believed that Juror Number 12 had convinced herself that Davis was intentionally near the jury room. Juror Number 3 stated that he thought Davis

was simply lost when he was in the hallway near the jury room, and that as soon as Davis saw the jury room signs he turned back.

The district court next examined each of the other jurors in chambers. Counsel, and a court reporter were present for the hearing. The district court asked each juror questions based on questions submitted by counsel per the court's instructions. Based on the hearing, the district court dismissed Juror Number 12, and denied Defendants' motion for a mistrial.

The trial resumed. At the close of evidence, both Defendants moved for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Tellez also moved for a dismissal based on a material variance between the indictment and the evidence presented. The district court denied both motions. The jury deliberated, and convicted Defendants.

The district court held a joint sentencing hearing for Defendants on December 22, 2008. The district court sentenced Davis within the statutory mandate to 120 months incarceration and an eight year period of supervised release. In sentencing Tellez, the district court increased Tellez' base offense level from 26 to 36, finding upon a preponderance of the evidence that Tellez was responsible for a greater quantity of drugs than the amount for which he was convicted. The district court also applied firearm, and career offender enhancements to Tellez, further raising Tellez' offense level to 38. Instead of a Guidelines range of 120 to 150 months, the district court found Tellez' Guidelines range was 360 months to life. The district court ultimately sentenced Tellez to a 300 month term of imprisonment, 60 months below the bottom of the Guidelines range it found applicable.

At the close of the sentencing hearing the district court asked whether Defendants had objections to the sentences. Tellez objected to the use of his acquitted conduct, the application of a firearm enhancement to his sentence, and the court's denial of his request for downward departure. Tellez did not object to the court's sentencing him as a career offender.

## II. DISCUSSION

### A. Motion for Mistrial Based on Jury Contact

#### 1. Standard of Review

This Court reviews the district court's decision not to grant a mistrial for extraneous influence on the jury under an abuse of discretion standard. *United States v. Orlando*, 281 F.3d 586, 593 (6th Cir. 2002); *United States v. Waldon*, 206 F.3d 597, 607 (6th Cir. 2000); *United States v. Pennell*, 737 F.2d 521, 533 (6th Cir. 1984).

#### 2. Analysis

Defendants contend that the district court abused its discretion in refusing to grant a mistrial after Defendant Davis encountered Juror Number 12 and Juror Number 3 in the hallway near the jury room.

In *Remmer v. United States*, 347 U.S. 227 (1954), the Supreme Court held that "in a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial" requires "notice to and hearing of the defendant, [to establish] that such contact with the juror was harmless to the defendant." *Id*. at 230. The Supreme Court subsequently reaffirmed the *Remmer* hearing requirement, stating that it has "long held that the remedy for allegations of juror

partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982).

In *Smith*'s wake this Court has held:

[f]our principles govern claims of extraneous, prejudicial influences on a jury: (1) when a defendant alleges that an unauthorized contact with a juror has tainted a trial, a hearing must be held; (2) no presumption of prejudice arises from such a contact; (3) the defendant bears the burden of proving actual juror bias; (4) juror testimony at the 'Remmer hearing' is not inherently suspect.

*Orlando*, 281 F.3d at 596; *see also United States v. Zelinka*, 862 F.2d 92, 95-96 (6th Cir. 1988).

In this case, the district court adhered to these four principles. After Juror Number 12 and Juror Number 3 informed the district court of their contact with Davis, Defendants moved for a mistrial based on prejudicial contact with the jury. The district court initially denied the motions for mistrial, but when Defendants renewed their motions the district court held a *Remmer* hearing.

In counsel's presence, the district court first questioned the two jurors who encountered Davis, and signed the note to the court. In response to the district court's questioning, Juror Number 12 stated that she believed Davis knew he was not supposed to be near the jury room, that the encounter was "unnerving," and made her feel "uncomfortable." Counsel for Davis and Tellez also had the opportunity to question Juror Number 12. In response to their questions, Juror Number 12 stated that Davis' proximity to the jury room made her feel intimidated, and that she discussed the encounter with the other jurors. However, Juror Number 12 stated that she would nevertheless be able to decide the case impartially.

The court next questioned Juror Number 3 who had also signed the note. Juror Number 3 stated that he thought the language of being "freaked out" used in the jurors' note was overstated,

and that Juror Number 12 had convinced herself that Davis had been in the area intentionally. He stated that he did not think much of the encounter with Davis as he thought it was "obvious that [Davis] was lost," and was not intentionally near the jury room. (Br. of Appellee at 24.)

The court also held a hearing to question the remainder of the jurors who heard about the encounter second-hand. Rather than affording counsel opportunity to question each juror, the district court stated that it would ask these jurors questions submitted to the court by parties' counsel. Neither Davis' nor Tellez' attorney objected to this procedure. The district court proceeded to ask the remaining jurors whether they had heard of the encounter with Davis, and whether it would affect their impartiality. Although most of the jurors had heard about the encounter, none stated that it would affect their deliberations.

At the close of the hearing the district court dismissed Juror Number 12, and denied Defendants' motions for mistrial. The district court explained that it was denying Defendants' motions because the lobby where Davis encountered the jurors is a public area, Davis made no verbal contact with jurors, and Juror Number 12, who the court had dismissed, was the only juror who believed that Davis had done anything wrong. The remainder of the jurors stated in the *Remmer* hearing that their impartiality was unaffected by anything Juror Number 12 told them about the encounter.

As required by this Court, the district court's *Remmer* hearing was "unhurried and thorough" and "[d]efense counsel were permitted to question the jurors" to determine whether jurors were prejudiced by the contact. *See Zelinka*, 862 F.2d at 96; *see also Pennell*, 737 F.2d at 529 (suggesting that counsel need not themselves ask the questions, when the *Remmer* hearing was conducted by the

court "[w]ith the concurrence of counsel for both parties"). Defendant bears the burden to show actual prejudice in a *Remmer* hearing. *Zelinka*, 862 F.2d at 96. Cases in this Circuit suggest that unless the district court finds that the jury was actually prejudiced it need not grant a mistrial based on non-prejudicial contact with the jury. *See, e.g.*, *id*. at 93-94 (finding that although a "spectator who appeared to be associated with [defendant]" said to jurors "it would be too bad if the elevator should crash," as the jurors stated that they "did not believe either side was attempting to influence their verdict, and . . . they could continue as impartial jurors," the jury was not prejudiced); *Pennell*, 737 F.2d at 529 (finding no prejudice when five jurors received anonymous telephone calls that they "had better" find the defendant guilty).

Based on the *Remmer* hearing, the district court determined that Juror Number 12, the only juror apprehensive about the encounter, should be dismissed due to possible prejudice. The remainder of the jurors stated that they were unaffected by the encounter. A juror's ability to gauge their own partiality is not inherently suspect. *Orlando*, 281 F.3d at 596. Therefore, it was proper for the district court to base its determinations of juror prejudice on the jurors' statements, and determine that the remainder of the jurors were not prejudiced. The district court did not abuse its discretion in refusing to grant a mistrial.

## B.      Sufficiency of the Evidence Against Davis

### 1.      Standard of Review

When reviewing for the sufficiency of evidence in support of a jury verdict, this Court views the evidence in the light most favorable to the prosecution and gives the prosecution the benefit of all reasonable inferences from the testimony. The question the court must ask is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*United States v. Caver*, 470 F.3d 220, 232 (6th Cir. 2006). "[A] defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Jackson*, 473 F.3d 660, 669 (6th Cir. 2007). The Court is "bound to make all reasonable inferences and credibility choices in support of the jury's verdict." *Id.* at 669-70.

### 2. Analysis

Davis was convicted of conspiring to intentionally distribute, and conspiring to knowingly and intentionally possess 500 grams or more of a mixture and substance containing a detectable amount of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and of knowingly and intelligently possessing with intent to distribute, and distributing 500 grams or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841(a)(1), and 18 U.S.C. §2.

The elements of a conspiracy are: "(1) an object to be accomplished. (2) A plan or scheme embodying the means to accomplish that object. (3) An agreement or understanding between two or more [individuals] whereby they become definitely committed to cooperate for the accomplishment of the object by the means embodied in the agreement, or by any effectual means." *Caver*, 470 F.3d at 232 (internal quotations and citation omitted). In the context of a conspiracy to violate the federal drug laws, "the government must prove, beyond a reasonable doubt, (1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy." *Id.* (internal quotations and citations omitted). This Court explained in *Caver* that a "vertical pattern of [drug] distribution" can

> form a 'chain' conspiracy where an agreement to supply drugs to a given area can be
> inferred from the interdependence of the enterprise. That said, the agreement to enter
> into a transaction . . . is not equivalent to the agreement needed to support a
> conviction for conspiracy . . . [which] must be based on evidence from which a

9

rational trier of fact could find that the defendant had knowledge of the conspiracy itself, and purposefully joined the conspiracy.

*Id*. at 233. "Proof of a formal agreement is not required to establish a conspiracy; a tacit or material understanding among the parties is sufficient." *United States v. Driver*, 535 F.3d 424, 429 (6th Cir. 2008).

Evidence demonstrating Davis' involvement in the drug conspiracy was presented at trial in two forms: through testimony of co-conspirators who had entered into plea agreements with the government, and through phone calls that the government had intercepted through its wiretap on Chapparo's and Arturo's phone lines.

Davis initially became involved with Chapparo and Arturo when Arturo asked Tyshawn, Davis' nephew, if he knew anyone outside of Nashville who might be interested in buying and distributing cocaine. Tyshawn responded that his uncle in Memphis, Davis, might be interested. Chapparo testified that he first met Davis on July 31, 2006 at a recreation center by a lake with Arturo and Tyshawn. Tyshawn, Allen Conner, and Davis arrived at the meeting in a blue SUV that authorities later determined was registered to Davis and his wife. At this meeting Arturo agreed to give Davis one kilogram of cocaine on credit, which Arturo directed Chapparo to provide. Later that day authorities intercepted a call in which Davis asked Chapparo when Davis would receive the kilogram of cocaine, and Chapparo promised to have it delivered later that day.

Conner testified that Davis received the kilogram of cocaine at a car wash in Nashville. Arturo testified that Tellez delivered the cocaine to Davis. Davis and Conner agreed that they would resell the kilogram of cocaine in Memphis, and split the profits. Conner was arrested in Memphis with the kilogram of cocaine. Davis met with Arturo and Chapparo a number of times to discuss

10

payment after Davis failed to pay for the cocaine. Tyshawn also identified Davis' voice on several calls intercepted on Chapparo's phone.

Davis argues that the government's evidence against him is insufficient because "[e]very witness for the prosecution . . . worked for the government in some capacity . . . as an employee, in the case of the federal agents or, in the case of the several alleged co-conspirators, in order to obtain favorable treatment in their own criminal matter." (Br. of Appellant Davis at 19.) Davis further asserts that the government's only other witnesses against Davis never "testified they ever saw him with drugs; rather each testified that they heard about it or inferred it from other conversations." (*Id.* at 20.)

To be clear, Davis is not appealing the district court's decision to admit any of the government's evidence against him. Davis is only arguing that based on witness' credibility and the circumstantial nature of some of the evidence, the evidence presented is insufficient to convict him. This Court has held, however, that in reviewing a conviction for sufficiency of the evidence, conspiracy can be inferred through circumstantial evidence. *Caver*, 470 F.3d at 233.

Viewing the evidence in "the light most favorable to the prosecution," we cannot conclude that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 232. The evidence regarding Davis' drug convictions is sufficient, as multiple witnesses testified that Davis received cocaine from Chapparo and Arturo. The evidence regarding Davis' conspiracy conviction is not quite as strong, as there is no direct testimony that Davis entered into the drug transactions intending to join the drug conspiracy. However, there are sufficient circumstances that a reasonable trier of fact could find beyond a reasonable doubt that

Davis was guilty of conspiracy. These include, Davis' numerous contacts with Chapparo and Arturo, his plan with Conner to resell the cocaine, and Tyshawn's statement that Davis became involved with Chapparo and Arturo after Chapparo asked Tyshawn if he knew anyone interested in cocaine outside of Nashville.

There is sufficient evidence to sustain both of Davis' convictions.

### C.     Tellez' Severance Motion

#### 1.     Standard of Review

This Court reviews "the district court's denial of severance for a clear abuse of discretion." *Id*. at 237. However, where a claim for severance was denied but not renewed, the Court reviews the issue for plain error. *United States v. Allen*, 160 F.3d 1096, 1106 (6th Cir. 1998).

#### 2.     Analysis

Federal Rule of Criminal Procedure 8(b) provides that "[t]he indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately." FED. R. CRIM. P. 8(b). However, "if the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may . . . sever the defendants' trials." FED. R. CRIM. P. 14(a).

This Court has held that "a strong policy presumption exists in favor of joint trials when charges will be proved by the same evidence and result from the same acts," as in a conspiracy trial. *Caver*, 470 F.3d at 238. "Society has an interest in speedy and efficient trials . . . and . . . only if there is a serious risk that a joint trial would compromise a specific trial right of one of the

defendants, or prevent the jury from making a reliable determination about guilt or innocence," should the trials be severed. *Id*. Therefore, "a defendant seeking severance at trial bears a strong burden and must demonstrate substantial, undue, or compelling prejudice." *Id*.

Tellez moved for severance twice after his co-defendant encountered Juror Number 3 and Juror Number 12, arguing that Davis' encounter with the jurors prejudiced Tellez. Tellez argues that the district court abused its discretion in failing to rule on his renewed motion for severance which he raised prior to the *Remmer* hearing. However, Tellez failed to renew his motion for severance either at the close of the *Remmer* hearing, or at the close of evidence generally. This Court has "unequivocally stated that failure to renew a motion to sever at the close of evidence results in waiver of the motion." *Allen*, 160 F.3d at 1106. Thus, Tellez' severance motion is considered waived.

### D. Tellez' Motion for Acquittal Based on Variance

#### 1. Standard of Review

"The court of appeals reviews the question of whether a variance has occurred *de novo*." *Caver*, 470 F.3d at 235.

#### 2. Analysis

"Within the context of a conspiracy, a variance constitutes reversible error only if a defendant demonstrates that he was prejudiced by the variance and that the indictment alleged one conspiracy, but the evidence can be construed only as supporting a finding of multiple conspiracies." *Id*. at 235-36. Furthermore, "whether single or multiple conspiracies have been shown is usually a question

of fact to be resolved by the jury and is to be considered on appeal in the light most favorable to the government." *United States v. Segines*, 17 F.3d 847, 856 (6th Cir. 1994).

"To obtain reversal of a conviction because of a variance between the indictment and the evidence produced at trial, a defendant must satisfy a two-prong test: (1) the variance must be demonstrated and (2) the variance must affect some substantial right of the defendant." *United States v. Budd*, 496 F.3d 517, 521-22 (6th Cir. 2007). Prejudice to a defendant's substantial rights due to a variance generally comes in two main forms. One form of prejudice is if the "defendant is not enabled to present his defense and . . . [is] taken by surprise by the evidence offered at trial" due to the degree of variance between the indictment and the evidence presented at trial. *Id*. at 527. A second form of prejudice, which this Court has dubbed "the primary risk" in variance cases, is "the transference of guilt from defendants involved in one conspiracy to defendants in another conspiracy." *Caver*, 470 F.3d at 237. This second risk "increases in direct proportion to the number of defendants, and the number of conspiracies demonstrated at trial." *Id*.

In this case, Tellez was convicted of conspiring to distribute, or conspiring to possess with intent to distribute cocaine in connection with the alleged drug conspiracy. At trial a significant amount of evidence was presented connecting Tellez to the conspiracy. Chapparo testified at trial that he delivered cocaine to Tellez more than twenty times, that he picked up drug proceeds from Tellez more than twenty times, and that Tellez helped him count drug proceeds more than twenty times. Chapparo also identified Tellez' voice on several calls intercepted on Chapparo's phone line in which delivery of cocaine and payments for cocaine were discussed. Arturo likewise testified that Tellez was involved in the conspiracy, and that Arturo would give cocaine to Chapparo to deliver

to Tellez. Arturo also identified Tellez' voice in several intercepted calls discussing distribution of several dozen kilograms of cocaine, and payment collection.

Tellez' brother and cousin also testified against Tellez pursuant to plea agreements stemming from a federal cocaine conspiracy charge in Texas. Tellez' brother and cousin testified that they brought and sent Tellez cocaine from Texas to Nashville.

The evidence does tend to show that Tellez was involved in two conspiracies, one based in Nashville, and one based in Texas. However, to the extent that there was a variance between the indictment and the evidence at trial in the number of conspiracies demonstrated, this variance did not affect Tellez' substantial rights. The nature of the two conspiracies was sufficiently similar, as was the evidence of Tellez' roles, such that Tellez was not in danger of being surprised by the evidence presented against him at trial. Nor was Tellez more likely to be convicted for involvement in the Tennessee conspiracy based on evidence presented regarding the Texas conspiracy. With or without Tellez' brother's and cousin's testimony, ample evidence was presented at trial demonstrating that Tellez was involved in a conspiracy to distribute the 500 grams or more of cocaine for which he was convicted.

### E.    Use of Acquitted Conduct in Calculating Tellez' Offense Level

#### 1.    Standard of Review

"This court reviews a constitutional challenge to a defendant's sentence *de novo* wherever the defendant preserves the claim for appellate review. Where a defendant fails to make an . . . objection, this court must review the claim for plain error." *United States v. Copeland*, 321 F.3d 582, 601 (6th Cir. 2003).

**2.       Analysis**

Tellez contends that his Sixth Amendment rights were violated by the sentencing court's finding by a preponderance of the evidence that he was responsible for conspiring to distribute at least 50 kilograms of cocaine, although the jury only convicted him for conspiring to distribute 500 grams of cocaine. Tellez does not contend that the district court failed to find that he was responsible for 50 kilograms of cocaine by a preponderance of the evidence. He limits his challenge to the constitutional issue.

This Court held in *United States v. White*, 551 F.3d 381 (6th Cir. 2008) (en banc), that "the Sixth Amendment [does not] prevent[] a district court from relying on acquitted conduct in applying an advisory [sentencing] guidelines system. In the post-*Booker* world, the relevant statutory ceiling is no longer the Guidelines range but the maximum penalty authorized by the United States Code." *Id.* at 384 (internal quotations omitted). Therefore, "a post-*Booker* sentencing court may consider even acquitted conduct if it finds facts supporting that conduct by a preponderance of the evidence." *United States v. Mendez*, 498 F.3d 423, 427 (6th Cir. 2007) (internal quotations and citations omitted).

Tellez' Sixth Amendment argument was foreclosed by this Court's en banc decision in *White*.

**F.       Firearm Enhancement to Tellez' Sentence**

**1.       Standard of Review**

"A district court's finding that a defendant possessed a firearm during a drug crime is a factual finding subject to the clearly erroneous standard of review." *United States v. Darwich*, 337 F.3d 645, 664 (6th Cir. 2003).

16

This Court reviews the district court's finding of sentencing facts for clear error. The district court's application of the enhancement framework "will only be clearly erroneous when, although there may be some evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id*. at 663. This Court "will uphold the district court's decision as long as it has interpreted the evidence in a manner consistent with the record. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id*. at 664.

### 2.    Analysis

Under the Sentencing Guidelines, firearm enhancement analysis has two steps,

First, to meet is initial burden, the government must show by a preponderance of the evidence that the defendant possessed the firearm while committing a drug trafficking offense.

Second, if the government is successful in meeting its initial burden, the burden shifts to the defendant to demonstrate that it was clearly improbable that the weapon was connected to the offense.

*United States v. Davidson*, 409 F.3d 304, 312 (6th Cir. 2005).

Tellez contends that there is insufficient evidence that he possessed a gun in connection with the commission of the conspiracy to support the firearm enhancement. Several witnesses testified that they saw Tellez with a "Dillinger" when he was delivering cocaine, and one witness testified that he sold Tellez a Smith and Wesson. Tellez contends that these witnesses are not credible, and that the government failed to conclusively connect Tellez with a firearm. Although the strength of the evidence connecting Tellez with a gun is questionable, concluding that Tellez possessed a firearm is a "permissible view[] of the evidence." *Darwich*, 337 F.3d at 664. Moreover, Tellez

17

provides no evidence that it was "clearly improbable" that any gun in his possession was not used in connection with the conspiracy. *Davidson*, 409 F.3d at 312. The district court thus did not plainly err in applying the firearm enhancement to Tellez.

> **G. Application of Career Offender Status to Tellez and Refusal to Depart Downward**

> **1. Standard of Review**

"This Court reviews *de novo* a lower court's determination that a defendant is a career offender for sentencing purposes." *United States v. Wood*, 209 F.3d 847, 849 (6th Cir. 2000). In so doing, "[t]his Court reviews a district court's legal conclusions regarding the Sentencing Guidelines *de novo*." *United States v. Galloway*, 439 F.3d 320, 322 (6th Cir. 2006). "Moreover, [this Court] review[s] a district court's factual findings in applying the Sentencing Guidelines for clear error." *Id*.

This Court reviews a district court's "ultimate decision" regarding a downward departure "for an abuse of discretion." *United States v. Smith*, 278 F.3d 605, 609 (6th Cir. 2002). However, "[t]he Court reviews *de novo* the issue of whether the district court was aware of its authority to depart downward." *Id.*

> **2. Analysis**

A defendant qualifies as a career offender under the Sentencing Guidelines if "the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance." SENTENCING GUIDELINES MANUAL § 4B1.1. "In order to determine whether a defendant's prior conviction is a controlled substance offense for purposes of § 4B1.1, the Sixth Circuit has adopted a categorical approach. Generally speaking, only the fact of the prior conviction and the

18

statutory definition of the predicate offense are used to determine whether a prior conviction is a controlled substance offense." *Galloway*, 439 F.3d at 322 (internal citations omitted). Tellez' three prior felony convictions for controlled substance crimes, place him within the definition of a career offender.

This Court "generally presumes that district judges are aware that they have [the] discretionary authority [to depart downward from a career offender status]." *Smith*, 278 F.3d at 610. However, on review this Court can find "that the usual presumption that sentencing courts are aware of their authority to depart does not apply" when a defendant's "case [falls] outside of the heartland of cases in which the career offender provision is usually applied." *Id.*

This Court's downward departure case law is inapposite. Although the district court did find that Tellez was a career offender, this finding did not affect Tellez' sentence. Tellez was sentenced at an offense level of 37. This offense level is one point more than his base offense level of 36, but one point less than his base level of 36 plus the two-point firearm enhancement. This produced a discretionary Guidelines range of 360 months to life. The district court ultimately sentenced Tellez to 300 months. Although the district court did not explicitly state that it was not considering Tellez' career offender status, the point calculation used, and Tellez' sentence of 60 months below the bottom of the advisory Guidelines range, demonstrate that it was not a consideration in the district court's sentencing.

**H.      Procedural and Substantive Reasonableness of Tellez' Sentence**

      **1.      Standard of Review**

This Court reviews preserved sentencing challenges "under a deferential abuse-of-discretion standard for reasonableness." *United States v. Herrera-Zuniga*, 571 F.3d 568, 581 (6th Cir. 2009). However, "[w]here a defendant fails to properly preserve an issue for appeal, that claim is subject to review for plain error only." *Id*. at 580.

### 2.    Analysis

Tellez objects to the reasonableness of his 300 month sentence, which is 60 months below the suggested Guidelines range of 360 months to life. This Court "review[s] all sentences – whether inside, just outside, or significantly outside the Guidelines range – under a deferential abuse-of-discretion standard." *United States v. Bolds*, 511 F.3d 568, 578 (6th Cir. 2007). This reasonableness review "has two components: procedural and substantive." *Id*. "Consequently, [the Court's] reasonableness review requires inquiry into both the length of the sentence and the factors evaluated and the procedures employed by the district court in reaching its sentencing determination." *Herrera-Zuniga*, 571 F.3d at 581 (internal quotations omitted).

Before evaluating the procedural reasonableness of Tellez' sentence, the Court must "determine what standard of review applies" by "determin[ing] whether [defendant] preserved these claims for appeal." *Id*. at 578. As the Court held in *United States v. Bostic*, 371 F.3d 865, 872 (6th Cir. 2004), "district courts are required, after announcing sentence, to ask the parties whether they have any objections to the sentence that have not previously been raised." *Herrera-Zuniga*, 571 F.3d at 578. If the defendant fails to raise an error "[w]here the sentencing judge complies with this procedure, the defendant generally forfeits the right to challenge on appeal any procedural errors to

which he did not object at the time of sentencing." *Id*. Such errors will be reviewed for plain error only. All challenges raised at sentencing will be reviewed for reasonableness. *Id.* at 581.

After sentencing Tellez, the district court asked whether Defendants objected to the sentence as required by *Bostic*. Tellez' counsel replied that Tellez objected to the firearm and drug quantity enhancements, and to the court's refusal to depart downward and sentence Tellez to a term of imprisonment closer to the statutory minimum. On appeal Tellez contends that his sentence was procedurally unreasonable because: (1) the sentence is outside the appropriate Guidelines range as the district court misapplied the Guidelines by enhancing Tellez' base offense level using acquitted conduct and a firearm enhancement; and (2) the district court did not adequately explain the chosen sentence.

Procedural reasonableness review "begins with a robust review of the factors evaluated and the procedures employed by the district court in reaching its sentencing determination." *Bolds*, 511 F.3d at 578. Specifically,

> [i]n reviewing sentences for procedural reasonableness [the Court] must ensure that the district court: (1) properly calculated the applicable advisory Guidelines range; (2) considered the other § 3553(a) factors as well as the parties' arguments for a sentence outside the Guidelines range; and (3) adequately articulated its reasoning for imposing the particular sentence chosen, including any rejection of the parties' arguments for an outside-Guidelines sentence and any decision to deviate from the advisory Guidelines range.

*Id*. at 581.

Tellez first challenges that the district court misapplied the Guidelines by using acquitted conduct and a firearm enhancement to increase his base offense level and advisory sentence range. This challenge was raised below and should be reviewed for abuse of discretion. *Herrera-Zuniga*,

571 F.3d at 581. As previously discussed, the district court did not abuse its discretion in using either acquitted conduct or the firearm enhancement in calculating Tellez' offense level. These facts were proved by a preponderance, and Tellez' resulting sentence was below the statutory maximum.

Tellez' second challenge, that the district court did not adequately explain the chosen sentence – whether it was based on the offense level plus firearm enhancement, or career offender status – was not preserved for appeal. Tellez did not raise this challenge at the sentencing hearing. It should thus be reviewed for plain error only. To establish plain error, a defendant must show: "(1) error[,] (2) that was obvious or clear, (3) that affected defendant's substantial rights[,] and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc). Whether or not the district court erred in not clarifying whether Tellez' sentence was calculated based on his offense level plus a firearm enhancement, or based on Tellez' career offender status, Tellez fails to demonstrate that there was plain error. Any deficiency in the district court's explanation did not affect Tellez' substantial rights as either calculation produces an advisory Guidelines range of 360 months to life, from which the district court departed downward by 60 months.

Tellez also challenges the substantive reasonableness of his sentence. A defendant "is not required to object to the substantive reasonableness of his sentence to preserve that issue for appeal." *Herrera-Zuniga*, 571 F.3d at 578. Substantive reasonableness review focuses on the appropriateness of "the length of the sentence." *Id.* at 581. This inquiry "take[s] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Bolds*, 511 F.3d at

581. In this inquiry the Court "appl[ies] a rebuttable presumption of substantive reasonableness" to "sentences within the Guidelines." *Id*.

The district court sentenced Tellez to 300 months, which is 60 months below the bottom of the advisory Guidelines range. This sentence, like sentences within the Guidelines range, is subject to a "rebuttable presumption of substantive reasonableness." *Id.* Tellez' arguments regarding the substantive unreasonableness of his sentence focus on the court's use of the firearm enhancement and acquitted conduct in calculating his base offense level. As discussed previously, the district court did not err in using these factors to calculate Tellez' sentence. Thus this argument is insufficient to rebut the presumption of substantive reasonableness for Tellez' below-Guidelines sentence.

## III. CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's decision.