NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0069n.06

No. 23-5822

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Feb 05, 2025
KELLY L. STEPHENS, Clerk

UNITED STATES OF AMERICA, )
)
    Plaintiff-Appellee, )
) ON APPEAL FROM THE
) UNITED STATES DISTRICT
v. ) COURT FOR THE MIDDLE
) DISTRICT OF TENNESSEE
)
SAMSON KANLA ORUSA, )
)
    Defendant-Appellant. ) OPINION

Before: SILER, KETHLEDGE, and BUSH, Circuit Judges.

KETHLEDGE, Circuit Judge. In 2021, a jury convicted Dr. Samson Orusa of 13 counts of Medicare fraud, and the district court sentenced him to 84 months in prison. Orusa now challenges his convictions on three grounds. We reject his arguments and affirm.

I.

Orusa received his medical degree in Nigeria, completed a residency in New York, and in 1997 opened a medical clinic in Clarksville, Tennessee. There, as the clinic's only physician, Orusa provided primary care. In 2004 he added pain management to his practice. By 2014, investigators began to suspect that Orusa was unlawfully prescribing controlled substances to his patients. After looking at his billing practices for Medicare, they suspected him of healthcare fraud as well.

Several witnesses at trial testified about how Orusa ran his clinic. Orusa required that patients seeking treatment for pain come into the clinic numerous times per month—with the number of required visits dependent on whether the patient had insurance. (Insured patients were

required to visit more often.) Orusa would often see 50 to 60 patients a day, and sometimes as many as 150 to 200. He also required patients with insurance to accept cortisone injections, sometimes on a weekly basis; patients who refused them were denied prescriptions for oxycodone.

In the fall of 2017, investigators installed pole cameras to record how many hours Orusa was at the clinic, so that his time there could be compared to his Medicare claims. An undercover agent also presented himself as a new patient seeking treatment for pain. The agent used a hidden camera to document (among other things) that he had to wait most of the day, was seen by Orusa for about ten minutes, and then left with a prescription for oxycodone. The agent made four more office visits and got two more prescriptions for oxycodone. For all those visits, Orusa's medical record overstated the extent of Orusa's physical examination. Eventually, agents executed warrants to search Orusa's home and clinic, where they seized patient charts, billing data, and financial information.

A federal grand jury thereafter returned a 45-count indictment, charging that Orusa had maintained the clinic as a drug-involved premises (Count 1), distributed oxycodone unlawfully (Counts 2-23), committed Medicare fraud (Counts 24-26), and engaged in two kinds of money laundering involving the proceeds of both the drug and healthcare-fraud offenses (Counts 37-45). *See* 21 U.S.C. §§ 841(a)(1), 856(a)(1); 18 U.S.C. §§ 1347, 1956(a)(1)(B)(i), 1957. In August 2021, during an eight-day trial, the jury heard testimony from investigators, employees, patients, and five experts. The jury ultimately acquitted Orusa on nine of the 22 drug-distribution counts, but found him guilty on all 36 other counts.

Shortly before sentencing, however, the Supreme Court clarified the *mens rea* required to convict a physician of unlawful distribution of controlled substances under 21 U.S.C. § 841's "except as authorized" clause. *See Ruan v. United States*, 597 U.S. 450, 468 (2022). Specifically,

the Court held, "once a defendant meets the burden of producing evidence that his or her conduct was 'authorized,' the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner." *Id*. at 457. Weeks later, Orusa moved for a new trial, arguing that the jury had not been instructed consistent with *Ruan*. That motion focused on the counts of drug distribution; Orusa made no argument as to why the instructional error as to those counts might have affected the jury's deliberations as to Medicare fraud. The government opposed the motion as untimely, arguing that any *Ruan* error was harmless. After several hearings—and in a lengthy, carefully reasoned opinion—the district court granted Orusa a new trial as to all the counts on which he had been convicted, save the 13 counts of Medicare fraud. Orusa then moved for reconsideration—a misnomer, since his arguments therein were new—seeking a new trial on those 13 counts as well. The district court denied the motion.

The court later sentenced Orusa to 84 months' imprisonment for the Medicare fraud. On the government's motion, the district court then dismissed the remaining counts with prejudice. This appeal followed.

## II.

## A.

Orusa appeals the denial of his motion for reconsideration, arguing that the district court's instructional error as to the § 841 counts (as measured after the fact by *Ruan*) affected the jury's deliberations on the Medicare fraud counts as well. Orusa did not object to the relevant instructions during trial, so we review only for plain error. *Greer v. United States*, 593 U.S. 503, 507-08 (2021); *see also United States v. Hofstetter*, 80 F.4th 725, 730 (6th Cir. 2023).

Plain error requires a defendant to show an error, that is obvious or clear, and that affected his substantial rights. *Greer*, 593 U.S. at 507-08. In this appeal we focus on whether the error

affected the defendant's substantial rights—which generally requires "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Id*. (citation omitted).

Orusa has not remotely shown any such probability here. As an initial matter, he concedes that the court's instructions as to the elements of healthcare fraud were proper. None of those elements required any proof of unauthorized distribution of controlled substances. *See United States v. Semrau*, 693 F.3d 510, 524 (6th Cir. 2012). Nor did the government present evidence that Orusa billed the government for any unlawful prescriptions. As a matter of elements and evidence alike, therefore, one can be skeptical of Orusa's claim that the jury's deliberations as to the two types of charges were intertwined.

The gravamen of the government's case as to Medicare fraud, rather, was that Orusa had presented the government with fraudulent bills for 13 office visits with established patients on particular dates in 2017. None of the alleged fraud as to those visits concerned billing Medicare for drug prescriptions. To the contrary, as the jury instructions themselves made clear, the government alleged that Orusa had "defraud[ed] Medicare by billing for higher paying services than he delivered, upcoding, and ordering unnecessary procedures" and by "creat[ing] false and cloned medical records to justify the bills he submitted to Medicare for payment." PageID 2831. And on all those points, suffice it to say, the government's evidence at trial was overwhelming. True, the indictment also alleged that Orusa caused Medicare claims to be submitted "for prescriptions that were issued in violation of law or otherwise outside the bounds of accepted medical practice." At trial, however, the government presented no evidence about Medicare claims for prescriptions written by Orusa.

The record therefore provides no basis to think that the *Ruan* error here—concerning whether Orusa subjectively knew that the prescriptions he wrote for oxycodone were "authorized"—had much effect on the jury's deliberations as to whether Orusa had fraudulently (and quite separately) billed Medicare for the 13 office visits. Indeed, as the district court pointed out, the jury confirmed as much by *acquitting* Orusa of distributing oxycodone to two patients (Counts 5 and 6), while convicting Orusa of fraudulently billing Medicare for office visits with those same patients (Counts 28, 30, 32, 33). Orusa is not entitled to a new trial on the 13 counts of Medicare fraud.

B.

Orusa argues that the district court should have granted him a mistrial because one of the government's expert witnesses, Dr. Gene Kennedy, improperly testified that some of Orusa's medical records lacked credibility. We review the district court's denial of a mistrial on this ground for an abuse of discretion. *United States v. Caver*, 470 F.3d 220, 243 (6th Cir. 2006).

1.

Kennedy—himself a physician with a pain-management clinic—reviewed the charts of more than two dozen of Orusa's patients to assess the "medical legitimacy" of the opioid prescriptions that Orusa wrote for them. Orusa objected to Kennedy's report before trial and later moved to disqualify him as an expert. After a hearing, the district court entered a pretrial order prohibiting Kennedy "from rendering any legal opinions (such as stating a record was false or fraudulent) or invading the province of the jury (such as by claiming that a statement was or was not credible)."

At trial, Kennedy testified—as to each of the drug-distribution counts—that Orusa had prescribed oxycodone without a legitimate medical purpose and outside the bounds of professional

medical practice.  As relevant here, however, Kennedy also said (twice) that Orusa's handwritten notes of a physical exam were "not credible" (Patients K.C. and J.W.) and that 15 identical entries in another patient's record were "not credible" (Patient K.P.).  Defense counsel failed to object; but, at the very next break, the district court called out the prosecutor for violating its pretrial order and announced his intention to give a curative instruction.  Defense counsel then moved for a mistrial, which the judge denied.

The next morning, before Kennedy's cross-examination, the judge gave the following curative instruction:

> Ladies and gentlemen of the jury, during Dr. Kennedy's direct testimony, the government asked questions about credibility, and Dr. Kennedy responded to some of those questions by expressing his opinion about the credibility of certain medical records of various patients of the defendant.

> His opinion testimony about credibility was improper and has no relevance in this case.  Whether something is credible or is not credible is for you to decide as the fact finders in this case.  You are the ultimate judges of what is credible.  You are to disregard all testimony by Dr. Kennedy about credibility.

> Therefore, I instruct you that Dr. Kennedy's testimony about credibility of defendant's medical records is totally irrelevant to this case.  You [] shall not consider it in any way in your deliberations.  And I'll order you to put it out of your mind.  I'm also going to order that it be stricken from this record.

2.

When deciding whether to grant a mistrial based on improper testimony, courts consider five things.  *Caver*, 470 F.3d at 243.  Here, two of them favor Orusa:  namely, that the testimony was elicited by the prosecutor and that the testimony violated a pretrial order.  *Id*.  But the other three considerations weigh heavily against Orusa.  Specifically, the prosecutor did not act in "bad faith"; the improper opinion testimony was "only a small part of the evidence against the defendant"; and the court gave a curative instruction that was "immediate, clear, and forceful."  *Id*.  The district court did not abuse its discretion by denying Orusa's motion for a mistrial.

C.

Orusa finally argues that insufficient evidence supported his convictions for Medicare fraud because, he says, the jury could only speculate that he acted with fraudulent intent. Orusa failed to renew his motion for acquittal at the conclusion of his case, so we can reverse only if "the record is devoid of evidence pointing to guilt." *United States v. Kuehne*, 547 F.3d 667, 696-97 (6th Cir. 2008) (citation omitted).

Orusa has not made that showing either. A jury may infer intent to defraud from circumstantial evidence such as knowledge, conduct, concealment, and profits. *United States v. Persaud*, 866 F.3d 371, 380 (6th Cir. 2017). And here Orusa was plainly the architect of the scheme to defraud. He ran the clinic, decided what to bill Medicare, and required his Medicare patients to come in for office visits much more often than cash patients and to submit to repeated cortisone injections, whether they wanted them or not.

Moreover, the government's medical-coding expert, Kristen Folding, opined that none of the Medicare claims charged as healthcare fraud were eligible for payment. Count by count, Folding explained that Orusa had billed Medicare either at higher levels of services than he provided ("upcoding"), or based on nonspecific, repetitive, and nearly verbatim entries in the medical records ("cloning"). And even Orusa's coding expert agreed that three of the Medicare claims had been upcoded. Another government expert, Stephen Quindoza, aggregated all of Orusa's Medicare claims for office visits by date of service. Quindoza then estimated the number of hours, on average, that a doctor would be expected to spend to provide the same services that Orusa had claimed he had provided on a given day. For ten of the Medicare-fraud counts, Quindoza's estimates far exceeded the hours that the pole-camera data had shown Orusa was even at the clinic. A jury could infer from that analysis that Orusa intended to defraud Medicare.

The record is therefore "not devoid of evidence" that he acted with intent to defraud Medicare—instead it is replete with such evidence.

*    *    *

The district court's judgment is affirmed.